**THIS IS AN *EX PARTE* ENTRY.**

**UNITED STATES DISTRICT COURT**
**for the SOUTHERN DISTRICT OF INDIANA,**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| **LOYD WOODWARD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| *vs.* | ) | **CAUSE NO. 1:13-cv-1435-RLY-DKL** |
| | ) | |
| **DAVID ALGIE and LINDA ALGIE,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**ENTRY**

**Plaintiff's *Revised Ex Parte Petition for Pre-judgment***
***Writ of Attachment* [doc. 70]**
**and**
**Plaintiff's *Ex Parte Belated Motion for Extension of Time* [doc. 71]**

The plaintiff, Loyd Woodward, petitions a second time for the Court to issue a writ to the United States marshal to attach property of the defendants, David and Linda Algie, before judgment, in order to secure his ability to execute on the property if he obtains a money judgment in this Cause. The Court denied his first petition on substantive and procedural grounds. *Ex parte Entry and Order* [doc. 56] ("*Entry*"). Familiarity with the factual background and legal standards set forth in that *Entry* is assumed here. Although Mr. Woodward submitted a more developed argument supported by additional evidence,

he filed his petition late and he has again failed to show sufficient grounds for issuing the writ. For these reasons, explained below, his *Revised Ex Parte Petition for Pre-judgment Writ of Attachment* [doc. 70] ("*Revised Petition*") and his *Ex Parte Belated Motion for Extension of Time* [doc. 71] are denied.

### Late filing

In its February 14, 2014 *Entry* denying Mr. Woodward's first petition, the Court afforded him another opportunity to file a petition and ordered him to inform the Court whether and when he intended to so file. The Court advised that, if he did not file a renewed petition, then all of the related *ex parte* filings would be unsealed. On February 21, 2014, Mr. Woodward informed the Court that he intended to file a new petition and that he believed that it could be "on filed [*sic*] on or before March 7, 2014." *Response to Ex Parte Entry and Order* [doc. 64]. The Court accepted Mr. Woodward's deadline. *Ex Parte Order* [doc. 65]. At 11:51 p.m. on Friday, March 7, 2014, nine minutes from his self-identified deadline, Mr. Woodward filed a motion for an extension of time to Monday, March 10, 2014 "so that Plaintiff can insure [*sic*] that its Revised Petition is fully and properly compliant." *Ex Parte Motion Extension of Time* [doc. 68] ("*First Extension Motion*"). The Court granted this extension, specifically noting that "[t]here will be no further extensions of time." *Ex parte Order* [doc. 69]. On March 11, 2014, at 2:44 a.m., after the extended deadline had expired, Mr. Woodward filed the present *Revised Petition* and, at 12:58 p.m., ten hours later, he filed the present *Ex Parte Belated Motion for Extension of Time* [doc. 71]

("*Second Extension Motion*"), asking leave to file *instanter* his *Revised Petition*.

Thus, Mr. Woodward waited to file a motion to extend his first deadline until 11:51 p.m., nine minutes before the deadline expired, which ensured that the Court would not have seen the motion and could not have acted until after the deadline had expired. It was, in practical effect, a motion for an extension of time after his time had expired. The Court granted that motion at its first opportunity but, despite having received his requested extension, Mr. Woodward filed his *Revised Petition* two hours and forty-four minutes after his second self-identified deadline had expired and he did not ask for an after-the-fact further extension of time until ten hours later.

A court may extend a deadline after it has expired only on motion, for good cause shown, and if the movant's failure to meet the deadline was due to excusable neglect. Fed. R. Civ. P. 6(b)(1)(B). "Excusable neglect" includes, in appropriate circumstances, "inadvertence, mistake, or carelessness, as well as . . . intervening circumstances beyond the party's control." *Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership*, 507 U.S. 380, 388 (1993). The determination of whether a party's neglect of a deadline is excusable "is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." *Id.* at 395. Relevant circumstances, or factors informing a court's determination, include **(1)** the danger of prejudice to other parties; **(2)** the length of the delay and its potential impact on the judicial proceedings; **(3)** the reason for the failure to meet the deadline, including whether it was within the control

of the movant; and **(4)** whether the movant acted in good faith.  *Id.*; *Raymond v. Ameritech Corp.*, 442 F.3d 600, 606 (7th Cir. 2006).  Rule 6(b) "clearly gives courts both the authority to establish deadlines and the discretion to enforce them."  *Raymond*, 442 F.3d at 605.  The determination of excusable neglect is made in the context of the courts' duty to enforce deadlines in order to keep their caseloads moving:

> The district courts must manage a burgeoning caseload, and they are under pressure to do so as efficiently and speedily as they can, while still accomplishing just outcomes in every civil action.  See Rule 1; Civil Justice Reform Act of 1990, 28 U.S.C. §§ 471–482; Judicial Conference of the United States, *Long Range Plan for the Federal Courts* at 66 (1995).  Part of that job means that they are entitled — indeed they must — enforce deadlines.  Necessarily, they must have substantial discretion as they manage their dockets.  Consequently, this Court reviews decisions such as the district court's refusal here to grant the Reales a fourth extension of time only for abuse of discretion.

*Reales v. Consolidated Rail Corp.*, 84 F.3d 993, 996 (7th Cir. 1996).

> We live in a world of deadlines.  If we're late for the start of a game or the movie, or late for the departure of the plane or the train, things go forward without us.  The practice of law is no exception.  A good judge sets deadlines, and the judge has a right to assume that deadlines will be honored.  The flow of cases through a busy district court is aided, not hindered, by adherence to deadlines.

*Spears v. City of Indianapolis*, 74 F.3d 153, 157 (7th Cir. 1996).  Neither "repeated, wilful and recalcitrant conduct" nor reckless disregard for deadlines need not be shown before a court strictly enforces its deadlines.  *Raymond*, 442 F.3d at 607 (quoting *Wienco, Inc. v. Katahn Assocs. Inc.*, 965 F.2d 565, 568 (7th Cir. 1992)).  Finally, in making the determination whether the failure to meet a deadline was the result of excusable neglect, courts must hold parties accountable for the acts and omissions of their counsel.  *Pioneer Investment*, 507 U.S. at 396-

97.

In his *First Extension Motion*, filed on March 7, 2014, Mr. Woodward's counsel stated

that he "underestimated that two (2) weeks was sufficient. There are still several additional

items that need to be taken care [*sic*] in order to comply with the Court's recent order . . .

. ." As noted, he asked for a three-day extension, which was granted. In his present *Second*

*Extension Motion* asking the Court to rule the late filing of his *Revised Petition* timely, Mr.

Woodward's counsel presents his explanation for failing to meet his deadline:

> 2. Despite the Court's fair warning [that there would be no further extensions of time], Plaintiff were [*sic*] not able to file their [*sic*] Revised Motion until around 2 am the morning of this filing.

> 3. Normally, the undersigned would not make a belated filing without leave of the Court, however, part of the reason for the belated filing was due to the fact that the time it took to upload the exhibits was tremendous as the process failed three (3) times and had to be resubmitted. For example, on the file resubmission at around 2 am, the files did not upload for almost forty-five (45) minutes) [*sic*]. As a result, once the filing finally was able to upload, Plaintiff went ahead a [*sic*] submitted the filing so as to not cause a further delay.

> 4. The undersigned wishes that he could say that the delay in filing was the sole result of the above-referenced technological issues, but that was not the only issue. Had the technological issues not occurred, the filing would still have been delayed by about 30 minutes past the midnight hour.

> 5. As a result of the undersigned [*sic*] inability to workout [*sic*] certain complicated factual portions of the Revised Motion due to a misunderstanding realized at around 11 pm, Plaintiff was not able to complete the Revised Motion until around 12:30.

> 6. Furthermore, as a result of the same, Plaintiff had to revise the Third Affidavit of Loyd Woodward and had to resubmit the same without a signature by Mr. Woodward due to the lateness of the hour, which Plaintiff now also requests to supplement.

> 7. In light of the forgoing [*sic*], Plaintiff respectfully requests that this

belated Extension Request be granted.[1]

> [1] On a side note, Undersigned will insure [*sic*] a change in his practice going forward to insure [*sic*] that filings don't get filed so close to the filing cutoff deadline in order to avoid any technological issues or last minute issues they [*sic*] may occur.

*Second Extension Motion.*

Considering the *Pioneer Investment Services* factors, the Court notes that, while the Algies are unaware of Mr. Woodward's *ex parte* filings and, therefore, are not *knowingly* prejudiced by his failure to meet his deadlines, they have been prejudiced nonetheless by the inability of this case to advance to case management scheduling while these *ex parte* proceedings have been pending. This case was filed by Mr. Woodward in the Northern District of Texas in May 2013 and, by July 2013, the Algies had retained counsel and filed a motion to dismiss for lack of jurisdiction and to transfer the case to this Court.[1] The motion was granted and this case was transferred to this Court in September 2013. In October 2013, Mr. Woodward filed his original petition for a writ of attachment, *Ex Parte Petition for Pre-judgment Writ of Attachment* [doc. 26] ("*Original Petition*"), and the Algies filed their counterclaim and their first motion to dismiss. This was followed, in December 2013, by the Algies' second motion to dismiss. In late January and early February 2014, Mr. Woodward filed his first and second motions for sanctions against the Algies. The Court denied Mr. Woodward's *Original Petition* on February 14, 2014 and the Algies' motions to

---

[1] Supporters of the Algies contributed to a legal defense fund for them but it was apparently depleted by the Texas proceedings. The Algies are currently proceeding *pro se*.

dismiss on March 5, 2014.

While Mr. Woodward's *Original Petition* was pending, it was not feasible to set this case for an initial pretrial conference for the purpose of developing a case-management plan. The Algies have noticed and questioned the gaps in the docket that represent the *ex parte* filings and the Court should not misrepresent or prevaricate when asked for an explanation. It is time to move this case forward. In addition, courts' records are presumptively open to the public and sealing filings and Court rulings from both opposing parties and the public is disfavored and prejudices the strong public-policy and interest for open proceedings. This factor weighs against Mr. Woodward.

The second *Pioneer Investment* factor is the length of the delay and its potential impact on judicial proceedings. While the lateness of the filing and request for further extension here is not great, delays of as little as twenty-four hours have been deemed too much, even if a court's ruling on the matter at hand is not issued for weeks or months afterward.[2] See *Raymond*, 442 F.3d at 604; *Reales*, *supra*; *Spears*, *supra*[3]. The focus is not on

---

[2] The Court also notes that, in effect, the delay in filing the *Revised Petition* is not only two hours and forty-four minutes but has now extended for over a week. As discussed below, Mr. Woodward's affidavit, on which the new petition's showings depend, is not signed and thus is ineffective. No completed, signed affidavit has been submitted.

[3] In *Spears*, the plaintiff received two extensions of his deadline to respond to the defendants' January 3, 1994 motion for summary judgment. He characterized his second extension request as his "final" one. While he filed his response brief by the "final" March 1, 1994 deadline, he asked for a 24-hour extension of the deadline in order to file his supporting materials because of a "catastrophic computer failure." On February 6, 1995, ten months later, the district judge denied the plaintiff's motion for a 24-hour extension and granted the defendants' motion for summary judgment, based on the lack of supporting materials from the plaintiff. The Court of Appeals for the Seventh Circuit affirmed.

the delay caused by the late filing to the court's rulings, but on the circumstances as they existed at the time of the missed deadline. *Raymond*, 442 F.3d at 607. The effect on the judicial proceedings has been discussed above. This factor weighs against Mr. Woodward.

The third *Pioneer Investment* factor is the reason for the delay, including whether it was within the reasonable control of the movant. As described above, Mr. Woodward has been allowed to set his deadlines up to now. In his *First Extension Motion*, he asserted that he underestimated that two weeks was sufficient time to complete his revised petition but, when the *Entry* was issued, there were four weeks until his self-identified deadline of March 7, 2014 and the *Entry* detailed the problems with the *Original Petition* and the requirements for a revised petition, some of which necessitated discussions with the United States marshal in order to arrive at certain value and cost estimates. Despite the instructions in the *Entry* and Mr. Woodward's self-defined deadline, Woodward's counsel concedes that he did not initiate contact with the marshal until the week of Friday, March 7, 2014, his initial deadline.

In his *Second Extension Motion*, Mr. Woodward's counsel blames a technological problem and a misunderstanding which rendered him unable to file his *Revised Petition* in time. He asserts that, at first, his attempts to upload the exhibits failed three times and, finally, took forty-five minutes to successfully upload. Counsel candidly concedes that, regardless of the technological problem, he did not complete the *Revised Petition* until thirty minutes after the deadline expired due to a "misunderstanding," which he did not realize

until 11:00 p.m. and which rendered him unable to work out "complicated factual portions" of the petition in time. As it turned out, even at that time, the *Revised Petition* was not completed and still is not complete because the misunderstanding caused him to revise Mr. Woodward's affidavit at the last minute and to file it without his signature, which, of course, renders it ineffective.

Because neither Mr. Woodward's counsel's technological problem with uploading exhibits (particularly, whether it was on counsel's or the Court's end of the transmission), the nature of counsel's "misunderstanding," the complicated factual portions of the petition, nor the revisions to Mr. Woodward's affidavit are identified, the Court is unable to determine whether these specific issues constitute excusable neglect. However, it is clear that the effects of these problems in causing the late filings were within counsel's control and were primarily his fault. His failure to accurately estimate the time needed to complete the *Revised Petition* is inexcusable when the *Entry* was clear as to what was required. But even more egregious was counsel's failure to begin the necessary preparations for the *Revised Petition* until too late. Counsel did not contact the marshal to begin the discussion and data-gathering process until less than a week from his initial deadline of March 7, 2014. *Revised Petition* at 26, ¶ 57.[4] Waiting until the last minute to begin preparing and/or filing

_____

[4] Mr. Woodward states that he did not contact the marshal until after he had obtained his own estimates of the costs of seizure, transportation, and storage, based on his own criteria, including his estimate of the manpower that is necessary, loading the Business Assets onto a truck owned by the Algies (itself listed as a business asset), and transporting them to a storage facility selected by Mr. Woodward. However, the *Entry* stated that the marshal would execute the writ and "shall determine the service and items of costs and expenses that are appropriate for executing the writ and maintaining custody of the attached property," *Entry* at 9, and that the marshal "would use his discretion to determine which

a submission is virtually never excusable neglect. *See Blue v. Hartford Life & Accident Ins. Co.*, 698 F.3d 587 (7th Cir. 2012) (discussing *Spears, supra*)[5]; *Raymond*, 442 F.3d at 607; *Spears*, 74 F.3d at 157[6]. Counsel concedes his neglect by stating that he will "change in his practice going forward" to ensure that submissions are not filed so close to deadlines "in order to avoid any technological issues or last minute issues [that] may occur."

The Court also notes that, in addition to counsel negligently waiting until the last minute to begin the filing process, the technological problems with uploading might have been created or needlessly exacerbated by additional poor preparation and discernment. Of the 41 exhibits uploaded with the *Revised Petition*, only 7 were new: Exhibits HH [doc. 70-34] through NN [doc. 70-40]. The remaining 34 exhibits were already in the record as

---

property to seize and, in making that determination, he may consider factors such as the ease and expense of seizure, transportation, storage, risk of damage during storage and execution, and proceeds on execution," *id.* at 15. Because the marshal has the responsibility for seizing and holding attached property and, depending on the circumstances, seizure, transportation, and storage can present risks to personnel and property, the means and methods are for his determination and within his discretion. Depending on the circumstances, the marshal might determine not to seize available property and to keep the storage location confidential from all parties. Mr. Woodward states that the marshal informed him that he required at least two weeks to make the necessary arrangements and estimates. *Revised Petition* at 26-27, ¶ 57. Mr. Woodward's asserted misunderstanding about the responsibilities for determining estimates was unreasonable and, once again, his waiting until the last minute to make necessary contacts and preparations with the marshal is not excusable.

[5] "Here too [as in *Spears*], Blue's counsel had requested several extensions throughout the course of the litigation. Though presumably the events leading up to each extension were beyond his control, the inescapable fact is that he required extensions because he waited until the last minute to begin working on his motions."

[6] "Although we are sympathetic with the circumstances of Spears' problems — he alleged a computer breakdown in his office on the due date — it seems to us that the problem was really that he waited until the last minute to get his materials together. Spears apparently neglected the old proverb that 'sooner begun, sooner done.' When parties wait until the last minute to comply with a deadline, they are playing with fire."

attachments to Mr. Woodward's *Original Petition*[7] and did not need to be resubmitted. Thus, of the 20.22 mb of exhibits uploaded, only 5.08 mb, or roughly a quarter, needed to be uploaded.

Therefore, the causes of Mr. Woodward missing his deadlines were almost entirely within his counsel's control and, thus, attributable to his fault. He did not begin preparation of the *Revised Petition* until it was too late and he did not begin the process of filing until it was too late. In addition, he made poor decisions regarding the content of his filings which likely caused or largely contributed to his filing difficulties. This factor weighs heavily against Mr. Woodward.

The fourth factor is whether the movant acted in good faith. Mr. Woodward does not assert or argue good faith and the Court does not otherwise find good faith. The Court allowed Mr. Woodward to set his own deadline after reviewing the *Entry*, it accepted his deadline, and then granted his request for an extension which was effectively filed after the deadline. In granting that extension, the Court emphasized that there would be no further extensions. When a party in effect set his own deadlines and the court signaled that no further extensions would be granted, "it was incumbent upon him to be particularly diligent in ensuring that the deadline was met." *Spears*, 74 F.3d at 157. Counsel's moving

---

[7] The duplicate *Revised Petition* exhibits [docs. 70-1 through 70-33] are attached in the same order as the *Original Petition* exhibits [docs. 26-1 through 26-33], except that original Exhibit X [doc. 26-32 (70-24 revised)] was filed out-of-order, after Exhibit FF, in the original exhibits. The *Revised Petition*'s duplicate exhibits were filed in proper sequential order.

for extensions after deadlines expire — the first time virtually and the second time actually — also does not show diligence or good faith. *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 883 (7th Cir. 2012). The Court finds that Mr. Woodward has not shown good faith in filing his *Revised Petition*.

After considering all the circumstances and the weight and balance of the *Pioneer Investment* factors, and for the reasons explained above, the Court concludes that Mr. Woodward's failure to file the *Revised Petition* and a valid Woodward Affidavit on time was and is not the result of excusable neglect and that good cause does not exist to extend the March 10, 2014 deadline. Therefore, Mr. Woodward's *Second Extension Motion* is denied and the *Revised Petition* is denied as untimely. To the extent that it is considered separately, Mr. Woodward's request for leave to later file a signed revised Woodward affidavit [doc. 70-40], *Second Extension Motion* ¶ 6, is denied as well because the lack of excusable neglect is even greater.

## Grounds

Alternatively, even if the *Second Extension Motion* were granted, the *Revised Petition* still does not show that grounds exist to issue a writ of attachment. Mr. Woodward argues that the writ of attachment should be issued on the following grounds:

1. "[T]he Algies are currently engaged in transactions that, if permitted to complete, would result in transferring of the Business Assets to third parties outside of the State of Indiana and, absent the Business Assets, the Algies lack funds to satisfy Woodward's claims and/or any material amount of said claims." *Revised Petition* at 2, 31.

2. "[A] substantial likelihood [*sic*] that Defendants intend to and will convey the Business Assets subject to execution without offering the proceeds or any part thereof in partial satisfaction of Woodward's claims. If permitted, such a conveyance (as described herein) would be with the fraudulent intent to cheat, hinder or delay the creditors of the Algies or to permit the Business Assets to be conveyed with the fraudulent intent to cheat, hinder or delay Woodward's recovery of its claims in this matter." *Id.* at 2 and 15, ¶ 37.

3. "On multiple occasions wherein [*sic*] David [Mr. Algie], who is not a citizen of the United States (he is a native of New Zealand) indicated that he was going to be moving the business operations, including, without limitation, the LP1 Project, not only out of the State of Indiana, but out of the Country. Furthermore, David has represented to Woodward that if 'OBAMACARE' ever passed, that he would be [*sic*] move the business to Georgetown in the Grand Cayman Islands." *Id.* at 12, ¶ 27 (citations omitted).

4. "Furthermore, David and Linda have publically sated [*sic*] to multiple parties and the world at large that if Woodward is successful in this litigation that neither Woodward nor anyone else will ever obtain the LP1 (or rebranded LP1). \* \* \* Based on the forgoing, evidence exists that demonstrates that David and Linda will either destroy the Business Assets or flee with the Business Assets rather than subject the Business Assets to attachment. Again, in Mr. Algie's own words: "***FOR CERTAIN THE LP1 WILL NEVER FLY NOR WILL ANYONE EVER GET A KIT IF HE IS SUCCESSFUL.***" *Id.* at 15, ¶36 (citations omitted) and ¶ 37 (emphases added by Mr. Woodward; the original form is quoted below).

The so-called "Business Assets" are the business-related personal property associated with the LP1 project that, according to his purported affidavit [doc. 70-40], Mr. Woodward recalls observing at Mr. Algie's "business location" and at his residence in October 2012. *Woodward Affidavit*[8] ¶ 19; *Revised Petition* at 21, ¶ 42. Mr. Woodward's estimated value of

---

[8] For convenience, the Court will refer and cite to Mr. Woodward's purported affidavit [doc. 70-40] as the *Woodward Affidavit*, although, not being signed, it is neither an affidavit nor a declaration.

these assets is $63,797.00.[9]  *Id.*  Mr. Woodward asserts that the value of his claims amounts

to at least $972,967.00, not including lost future commissions on sales, lost future sales, and

the business value of the LP1 business.  *Woodward Affidavit* ¶ 28; *Revised Petition* at 25, ¶ 50.

If Mr. Woodward's purported affidavit were valid, the *Revised Petition* would adequately

shown that the Algies do not own sufficient assets to satisfy a judgment in the amount that

Mr. Woodward seeks.  The Algies' own statements and allegations in their *Motion to

Dismiss and Counterclaim* [doc. 27] and its attached exhibits confirm their lack of resources

to satisfy Mr. Woodward's claimed damages.

However, the *Revised Petition* still does not adequately show that the Algies either

**(1)** are "removing or about to remove [their] property subject to execution, or a material

part of the property, outside Indiana," Ind. Code § 34-25-2-1(b)(4), or **(2)** have sold,

conveyed, or otherwise disposed of, or are about to sell, convey, or otherwise dispose of,

their property subject to execution with the fraudulent intent to cheat, hinder, or delay Mr.

Woodward, Ind. Code § 34-25-2-1(b)(5) and (6).

Mr. Woodward contends that satisfaction of Ind. Code § 34-25-2-1(b)(4) is shown by

the fact that the Algies have made pre-sales of, and collected deposits for, future

LP1/ACA3 aircraft kits.  He asserts that the Algies have completed 17 of these pre-sales,

---

[9] Mr. Woodward also provided an estimated value of the Algies' "Personal Assets" (as opposed to their "Business Assets") of $68,300.00, *Revised Petition* at 22, ¶¶ 41 and 44.  The Personal Assets consist of the value of the Algies' residence, less statutory exemptions and estimated repair costs, and without regard to any encumbrances.  *Revised Petition* at 19-20, ¶ 41.  The *Revised Petition* states that "[g]iven that most of the Personal Asset Value appears to be in land (if not all land), a writ of attachment would not likely attach," *id.* at 20, ¶ 41, and it asks that only the Business Assets be attached, *id.* at 29, 33, 34.

the first 16 of which are the identical pre-sales, in the identical order, that Mr. Woodward made previously but was compelled to cancel and return the deposits. *Defendants' Motion to Dismiss and Counterclaim*, Exhibit 5 [doc. 27-5] (Algies' pre-sales); *Revised Petition*, Exhibit W [doc. 70-23] (Mr. Woodward's pre-sales). After Mr. Woodward ceased funding the LP1 program (his version) or after he partially terminated the Contract Agreement between himself and the Algies (the Algies' version)[10], the 16 customers to whom Mr. Woodward pre-sold the LP1 apparently cancelled their orders with him, received their deposits, and placed pre-sale orders and deposits, in the same order, with the Algies. The Algies apparently also made one additional pre-sale, bringing their total pre-sales to 17. The dates of the pre-sales are not given. None of the pre-sale customers are in Indiana.

Mr. Woodward argues that "[n]ot only will each sales [*sic*] of the Rebranded LP1 result in a transfer of the Business Assets outside of the State, but a portion of the income from the sale of the Rebranded LP1 will be diverted to the [Algies'] Sales Agent as a commission." *Revised Petition* at 14, ¶ 33. However, Mr. Woodward has not shown that the Algies are "removing or about to remove" any of the listed Business Assets outside of Indiana. The pre-sales are for completed, finished aircraft kits and there is no evidence that

---

[10] The Algies contend, in part, that, after **(1)** Mr. Algie completed the LP1 experimental aircraft to the point and within the time that he and Mr. Woodward agreed in the "Contract Agreement" [doc. 70-1] ("*Agreement*"); **(2)** Mr. Woodward continued to pay Mr. Algie $7,000 monthly long after the twelve-month period provided in the *Agreement*, and **(3)** Mr. Woodward paid hundreds of thousands of dollars more for the expenses of the LP1 program, not pursuant to the *Agreement*, Mr. Woodward handed Mr. Algie a document in October 2012 purporting to cancel the *Agreement* but retaining the marketing/sales program for the LP1. *Defendants' Motion to Dismiss and Counterclaim* [doc. 27] and Exhibit 4, "The Woodward Plan" [doc. 27-4] at 9.

the LP1/ACA3 aircraft kits are in production, have been shipped, or are about to be shipped. In fact, the evidence is to the contrary: the only indications are that the LP1 prototype has not been flight-certified and has not flown. There is no evidence that Mr. Algie is anywhere near production of kits ready for shipment and Mr. Woodward's list of the Algies' "Business Assets," based on his observations in October 2012, do not appear to contain the component materials, supplies, or parts out of which kits would be produced for shipment to customers. Furthermore, regardless of the pre-sales, no evidence has been presented or suggested that the Algies are "removing or about to remove" any of the listed "Business Assets," which consist primarily of machinery, tools, dies, ovens, molds, *etc.* There is no evidence that any customers have paid the Algies any additional amounts beyond their already-paid deposits. Finally, as Mr. Woodward has shown and the Algies allege, they have no resources of their own or outside sources of funding with which to get the prototype flown, flight-certified, or to even begin planning for production of kits. In fact, Mr. Algie alleges that he has ceased working on the LP1 program, *Defendants' Motion to Dismiss and Counterclaim* at 4 and 7, and Mr. Woodward himself asserts that "the Algies appear to be unable to complete the LP1 Project," *Revised Petition* at 33.

In addition to the Algies' pre-sales, Mr. Woodward argues two other means by which he asserts the Algies are "about to remove" their property out of Indiana: first, they will move the business operations out of the country and, second, they will destroy the LP1 Business Assets if Mr. Woodward prevails in this suit. The evidence on which Mr.

Woodward relies to support these assertions is insufficient.

Mr. Woodward relies on two indications that the Algies intend to move the Business Assets out of the country: first, "[o]n multiple occasions," Mr. Algie, who is not an American citizen, "indicated that he was going to be moving the business operations . . . out of the country" and, second, that Mr. Algie represented to Mr. Woodward that, if "Obamacare" passed, Mr. Algie would move the business to Georgetown in the Grand Caymen Islands. *Revised Petition* at 12, ¶ 27. In support of the first indication, Mr. Woodward submits a print of Mr. Algie's page on the "Patriot Action Network" website, [doc. 70-37], but there is nothing in the content of this print that addresses or suggests anything about the idea of emigration from the country in general, let alone any intention on Mr. Algie's part to emigrate. If Mr. Woodward intends to also aver that Mr. Algie personally told him on multiple occasions that he was going to move his business operations out of the country, then such a conclusory statement lacks sufficient factual details for the Court to conclude that any such move is in process, imminent, or planned. Similarly, Mr. Algie's alleged representation that, if "Obamacare" passed, he would move his business operations to the Grand Caymen Islands lacks the details to show that such a move is in process, imminent, or even planned. "Obamacare" was signed into law in March 2010, during the alleged 24-month term of the parties' *Agreement* and before Mr. Woodward last observed the Business Assets *in situ* in October 2012, so he should have been able to aver any preparations if Mr. Algie were "about to remove" the Business Assets

for that reason.  With no evidence that such a move is about to happen four years after the alleged triggering event, this alleged evidence is not persuasive.  Moreover, as noted above, Mr. Woodward has strongly asserted in the *Revised Petition*, and presented evidence in support, that the Algies do not have substantial liquid assets, and the Algies have made similar allegations.  Thus, the Algies do not appear to have the resources to effect a move of the Business Assets to the Grand Caymen Islands or any other location outside the country.  Mr. Woodward has shown no persuasive evidence that either of the Algies "is removing or about to remove" the Business Assets out of the country.

Finally, Mr. Woodward cites the following excerpt from what is apparently an update that Mr. Algie added to his LP1/ACA 3 website regarding the status of the LP1 program and the commencement of Mr. Woodward's suit:

> Thanks as always to everyone for some nice comments!  Well I have not posted anything on here for some time but the latest update is that Loyd Woodward is suing me.  He told me not to say much online or it would make future negotiations more difficult, but he went and sued me anyway.  The suit states money but it's clear he wants the entire LP1 program, prototype aircraft, tooling and all.  If he wins this lawsuit I will end up with nothing to show for my 20 years of work by the $9.61 per hour I ended up making while Woodward was involved with me.  For certain the LP1 will never fly nor will anyone ever get a kit if he is successful.

[Doc. 70-25.]  There follow a sentence about contributions to his legal defense fund and the remainder of the update is about the current status of the LP1 aircraft's technical development.  Mr. Woodward argues that the last sentence of the excerpt shows that the Algies intend to destroy the Business Assets if he wins the suit.  The sentence is certainly

ambiguous and Mr. Woodward's could be one interpretation. However, reading the Algies' *Motion to Dismiss and Counterclaim* [doc. 27] and its attached and incorporated "journal", [doc. 27 at 3], Exhibit 4, "The Woodward Plan" [doc. 27-4], reveals that Mr. Algie contends that Mr. Woodward was unfamiliar with, unskilled in, and incompetent at the LP1 development processes and repeatedly attempted to sabotage the program. He believes that Mr. Woodward did not and does not possess the expertise to complete the aircraft. Thus, a more reasonable — at least, an equally plausible — interpretation of the last sentence above is that Mr. Algie believes that, if Mr. Woodward is successful in this suit and obtains the LP1 program, including the intellectual property, from Mr. Algie, that Mr. Woodward lacks the ability to get the prototype airborne and to get the LP1 kits to production, at least with the quality and design as intended by Mr. Algie. It would be extremely unexpected for Mr. Algie to include a threat to destroy the LP1 program, the prototype, and all the Business Assets in an otherwise innocuous public post updating the progress of the LP1 program. The Court is unconvinced that this sentence can bear the weight that Mr. Woodward tries to put upon it.

The Court concludes that the *Revised Petition* does not show that Ind. Code § 34-25-2-1(b)(4)'s criteria for issuance of a writ of attachment have been satisfied. The stray, isolated comments on which Mr. Woodward relies do not show that the Algies are removing or are about to remove the Business Assets out of the state or the country or are destroying, are about to destroy, or intend to destroy those assets in the event of a judgment in favor of Mr.

Woodward.

The *Revised Petition* also does not show satisfaction of the criteria under Ind. Code § 34-25-2-1(b)(5) or (6). As the *Entry* pointed out, to qualify under these sections, Indiana requires that fraud be shown on both the Algies' and their buyers' parts, *Entry* at 12-13, and the *Revised Petition* does not attempt a showing of fraud on the part of any past or potential future pre-sale customer. In fact, Mr. Woodward argues that, if the Algies' "sales of the Rebranded LP1 are realized Woodward will have no ability to attach the Business Assets as the third-party purchasers will be bona fide purchasers for value." *Revised Petition* at 14, ¶ 33. In addition, as discussed above, Mr. Woodward has not shown that the Algies have sold, conveyed, or otherwise disposed of, or are about to sell, convey, or otherwise dispose of, any of the listed Business Assets for fraudulent or non-fraudulent intentions. Finally, to the extent that Mr. Woodward argues that the Algies' alleged threat to destroy the Business Assets if he prevails in this suit shows that they intend to "dispose" of the Business Assets under § 34-25-2-1(b)(5) or (6), then the same analysis above applies.

In light of the above rulings, which dispose of Mr. Woodward's *ex parte* attempts to obtain issuance of a writ of attachment, it is unnecessary to address the additional deficiencies in the *Revised Petition*.

## Conclusion

Plaintiff's *Ex Parte Belated Motion for Extension of Time* [doc. 71] is **DENIED**.

Plaintiff's *Revised Ex Parte Petition for Pre-judgment Writ of Attachment* [doc. 70] is **DENIED**.

After the period for seeking review has expired, the Clerk of the Court will be directed to unseal and to serve on Defendants all *ex parte* documents associated with Plaintiff's petitions for a writ of attachment [docs. 26, 26-1 through 26-34, 35, 56, 64, 65, 68, 69, 70, 70-1 through 70-41, 71, and the present Entry] and this Cause will be scheduled for an initial pretrial conference for the purposes of, *inter alia*, establishing a case-management plan.

**DONE this date:** 03/21/2014

Denise K. LaRue
United States Magistrate Judge
Southern District of Indiana

Distribution:

**This is an *ex parte* Entry — not to be served on Defendants.**

United States Marshal.

Plaintiff's counsel *via* ECF-generated e-mail.