# UNITED STATES DISTRICT COURT
## for the SOUTHERN DISTRICT OF INDIANA,
## INDIANAPOLIS DIVISION

| | |
|---|---|
| **LOYD WOODWARD,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| *vs.* | ) CAUSE NO. 1:13-cv-1435-RLY-DKL |
| | ) |
| **DAVID ALGIE and LINDA ALGIE,** | ) |
| | ) |
| Defendants. | ) |

### *Ex parte* ENTRY and ORDER[*]

### Plaintiff's *Ex Parte Petition for Pre-judgment Writ of Attachment* [doc. 26]

Plaintiff has filed, *ex parte*, the above-entitled motion ("*Petition*"), asking that a writ of attachment be issued to the Marion County Sheriff to seize and hold property of the Defendants to ensure its availability to satisfy any judgment in favor of Plaintiff.

In December 2009, plaintiff Loyd Woodward and defendants David Algie and Linda Algie (David's wife), executed the following agreement, quoted in full:

### Contract Agreement

The purpose of the contract is to facilitate the completion of the David Algie's Light Plane 1 hence named the LP1. This will simply be referred to as the Agreement.

Parties to this contract are David Algie, Linda Algie, and Loyd Woodward

---

[*] This ruling was originally issued under seal on February 14, 2014 [doc. 56]. Pursuant to the *ORDER Unsealing ex parte filings*, issued on March 24, 2014 [doc. 75], it and all related filings, were unsealed. This ruling is being reissued at this time with the marginal and distribution *ex-parte* labels removed for the purpose of publication only. No substantive changes are intended.

a single man.

David Algie will receive from Loyd Woodward the sum of $7000.00 per month for one year. This will be used for support of David Algie so that he can devote his efforts to complete the LP1 to the point of flight certification.

Loyd Woodward will receive from David Algie the right to exclusively market the LP1 and its technology. It is understood that David Algie may have sold up to 5 kits already and these will not be subject to this agreement. For an additional sum of $40,000.00 Loyd Woodward will have purchasing rights of an LP1 for his individual use.

Loyd Woodward will also receive the rights to commercially market all improvements, inventions, and/or discoveries made during the development of the LP1, whether patentable, copyrightable or not. Loyd Woodward reserves the right to assign these rights to a business entity. These rights shall be joint property of David Algie and Loyd Woodward. Should unforeseen circumstances prevent David Algie from completing the project within 24 months then Loyd Woodward has the obligation and right to commercially market all properties regarding the LP1 now in custody of David Algie.

Executed this 30th Day of December 2009

*Contract Agreement* [doc. 1-1] ("*Agreement*") (signature lines omitted).

According to Mr. Woodward's complaint, David Algie is a designer who has primarily worked in the Indy-car industry as a designer and fabricator. Loyd Woodward is in the business of selling aviation-related equipment. Mr. Algie resides and works in Indiana; Mr. Woodward resides and works primarily in Texas. Mr. Algie became interested in aircraft design, specifically developing and producing a kit airplane with better component fit and finished detail work that the purchaser could assemble himself, without requiring the assistance of third-party assembler with superior skill levels. The

design also includes new technologies and/or materials. Eventually, Mr. Woodward agreed to provide financial help to Mr. Algie and "ultimately an agreement was reached that was memorialized into a Contract Agreement," *Plaintiff Loyd Woodward's Original Complaint* [doc. 1] ("*Complaint*") ¶ 7, which is quoted above.

Mr. Woodward eventually spent more on the LP1 project than the twelve monthly payments of $7,000 to Mr. Algie that was provided in the *Agreement*.[1] Ultimately, he "incurred expense associated with the development, production, marketing and sale of the LP1" in the total amount of $475,176, $259,500 of which was paid directly to Mr. Algie. *Complaint* ¶ 8. Mr. Woodward continued paying $7,000 to Mr. Algie after the initial twelve-month period. Mr. Woodward alleges that he entered into the *Agreement* and paid these additional amounts based upon Mr. Algie's representations about "the performance possibilities of the LP1" and Mr. Algie's "own abilities to finalize the LP1 and have same ready for production and sale within twenty-four (24) months." *Id.* As of the date of the *Complaint*, Mr. Algie "has failed to finalize and produce a single LP1, let alone a packaged kitplane product for sale to third parties." *Id.* Mr. Woodward notified Mr. Algie in October 2012 that he was ceasing funding the LP1 project.

Mr. Woodward claims that "David Algie has failed to do what he agreed to and said he would do[:] finalize the LP1 for production, marketing and sale" within twenty-four

---

[1] The *Complaint*'s language and the itemization included in the *Petition* [doc. 26, p. 4] suggest that Mr. Woodward paid some of the money directly to two other individuals who worked on the project and directly paid some expenses associated with the LP1 project.

3

months. *Complaint* ¶ 9. He pleads four causes of action, all under Texas law: **(1) breach of contract**, for Algies' "failure and unwillingness to honor and abide by the terms and conditions of the Contract Agreement" by not "producing and/or otherwise finalizing the LP1," *Complaint* ¶ 11; **(2) fraud**, for the Algies' making "false promises and representations" to Mr. Woodward regarding the "performance possibilities" of the LP1 and Mr. Algie's "own abilities to finalize the LP1 and have same ready for production and sale within twenty-four (24) months," *id.* ¶ 13; **(3) unjust enrichment**, for the Algies' unjustly receiving a substantial economic benefit from Mr. Woodward through manipulation and misrepresentations, *id.* ¶ 15; and **(4) promissory estoppel**, for the Algies' same misrepresentations above upon which Mr. Woodward foreseeably relied in funding and financing the LP1 project, *id.* ¶ 17. In addition to an award of unspecified damages, attorneys fees, and costs, Mr. Woodward seeks an injunction prohibiting the Algies from "secreting, removing, destroying, damaging or otherwise causing damage to the LP1, and any documents, materials, components, parts and/or accessories of the LP1." *Id.* ¶ 18.

Mr. Woodward now moves the Court, *ex parte*, to issue a writ of attachment under Ind. Code § 34-25-2-1(b)(4), (5), and (6) to the Sheriff of Marion County to seize specific property associated with the LP1 project (the "Subject Property"):

> A writ of attachment (this "Writ") is hereby issued against the Subject Property, which is identified as any and all items, parts, plans, equipment and other items, tangible or intangible, used and/or otherwise associated with the development, fabrication and building of that certain aircraft and/or aircrafts referred to as the LP1, the ACA3 and/or otherwise known by any other designation, in the possession and/or control of the Algies, and/or any

4

agent thereof, located anywhere within the State of Indiana . . . .

Proposed *Order of Attachment* [doc. 26-34] ("*Proposed Order*") ¶ 1. The *Proposed Order* also includes an order to the Algies:

> The Algies are hereby prohibited from secreting, removing, destroying, damaging or otherwise causing damage to the Subject Property, and any documents, materials, components, parts and/or accessories related to the Subject Property.

*Id.*, ¶ 5.

## Law

"At the commencement of and throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment. But a federal statute governs to the extent it applies." Fed. R. Civ. P. 64(a). Available remedies include attachment, garnishment, replevin, and sequestration. Fed. R. Civ. P. 64(b). Indiana law includes two authorizations for pre-judgment attachment: Rule 64 of the Indiana Rules of Trial Procedure and Indiana Code § 34-25-2-1.[2] Because Mr. Woodward does not cite or mention the Trial Rule, but relies solely on the provisions of the statute, it is only the statutory terms that the Court will examine. Ind. Code § 34-25-2-1 provides that pre-judgment attachment is available "when the action is for the recovery of money," Ind. Code § 34-25-2-1(b), and at least one of six circumstances is present, *id.* § 34-25-2-1(b)(1) - (6). Mr. Woodward

---

[2] There is no common-law writ or remedy of pre-judgment attachment in Indiana. *Rodde v. Hollweg*, 19 Ind.App. 222, 49 N.E. 282, 283 (Ind. App. 1898).

contends that attachment is available in this case under paragraphs (4), (5), and (6):

> (b) The plaintiff may attach property when the action is for the recovery of money and the defendant:
>
> \* \* \*
>
> (4) is removing or about to remove the defendant's property subject to execution, or a material part of the property, outside Indiana, not leaving enough behind to satisfy the plaintiff's claim;
>
> (5) has sold, conveyed, or otherwise disposed of the defendant's property subject to execution, or permitted the property to be sold with the fraudulent intent to cheat, hinder, or delay:
>
> > (A) the defendant's creditors;
> > (B) the state;
> > (C) a municipal corporation;
> > (D) a political subdivision; or
> > (E) a school corporation . . . ; or
>
> (6) is about to sell, convey, or otherwise dispose of the defendant's property subject to execution with the fraudulent intent to cheat, hinder, or delay:
>
> > (A) the defendant's creditors;
> > (B) the state;
> > (C) a municipal corporation;
> > (D) a political subdivision; or
> > (E) a school corporation . . . .

This statute also requires the plaintiff to "make an affidavit showing" (1) the nature of his claim, (2) that the claim is just, (3) the amount that he ought to recover, and (4) that one of the grounds for attachment in Ind. Code § 34-25-2-1(b) applies. Ind. Code § 34-25-2-4. It also requires the plaintiff to execute an undertaking, with sufficient surety payable to the defendant, that the plaintiff will duly prosecute the attachment proceeding and pay all damages suffered by the defendant if the attachment proceedings are both wrongful and

6

oppressive. Ind. Code § 34-25-2-5. Mr. Woodward asks the Court to prescribe a bond in the amount of no more than $2,500. *Petition* at 12.

Because statutory attachment operates in derogation of the common law, Indiana strictly construes its provisions in determining its applicability. *Instead v. Canc.*, 241 Ind. 440, 449, 172 N.E.2d 859, 864 (Ind. 1961). However, once it is determined that attachment is available in a particular case, the statute should be liberally construed to effect its remedial nature. *Schwedland v. Bachman*, 512 N.E.2d 445, 451 (Ind. Ct. App. 1987).

**Discussion**

**Executing officer.** Mr. Woodward requests that the writ be issued to the Sheriff of Marion County for execution, but the Court's writs are executed by the United States marshal for the southern district of Indiana, not a state sheriff.

> It is the primary role and mission of the United States Marshals Service to provide for the security and to obey, execute, and enforce all orders of the United States District Courts . . . .

28 U.S.C. § 566(a).

> Except as otherwise provided by law or Rule of Procedure, the United States Marshals Service shall execute all lawful writs, process, and orders issued under the authority of the United States, and shall command all necessary assistance to execute its duties.

28 U.S.C. § 566(c). The marshal, "in executing the laws of the United States within a State, may exercise the same powers which a sheriff of the State may exercise in executing the laws thereof." 28 U.S.C. § 564. When an available state pre-judgment remedy is employed

7

in federal court under Fed. R. Civ. P. 64, the state procedure must be adapted to federal practice, in part by providing for execution by a United States marshal, not a state sheriff. *See Yazoo & M. V. R. Co. v. City of Clarksdale*, 257 U.S. 10, 24, 42 S.Ct. 27, 31 (1921). The Court will not issue a writ of attachment to the Marion County Sheriff.

**Advance deposit for expenses.** The law requires the United States marshal to collect an advance deposit for the expenses of taking and keeping custody of attached property, and allows the marshal to require an advance deposit for the expenses and costs of serving the writ:

> **(a)(1)** The United States Marshals or deputy marshals shall routinely collect, and a court may tax as costs, fees for the following:
> \* \* \*
> **(A)** Serving a writ of . . . attachment in rem, . . . attachment . . . or any other writ, order or process in any case or proceeding.
> \* \* \*
> **(E)** The keeping of attached property (including boats, vessels, or other property attached or libeled), actual expenses incurred, such a storage, moving, boat hire, or other special transportation, watchmen's or keepers' fees, insurance, and an hourly rate, including overtime, for each deputy marshal required for special services, such as guarding, inventorying, and moving.
> \* \* \*
> **(G)** Necessary travel in serving or endeavoring to serve any process, writ, or order, except in the District of Columbia, with mileage to be computed from the place where service is returnable to the place of service or endeavor.
>
> **(H)** Overtime expenses incurred by deputy marshals in the course of serving or executing civil process.
>
> **(2)** The marshals shall collect, in advance, a deposit to cover the initial

> expenses for special services required under paragraph (1)(E), and periodically thereafter such amounts as may be necessary to pay such expenses until the litigation is concluded. This paragraph applies to all private litigants . . . .
>
> * * *
>
> **(d)** The United States marshals may require a deposit to cover the fees and expenses prescribed under this section.

28 U.S.C. § 1921.

The Court will not issue the requested writ of attachment without showings that **(1)** Mr. Woodward has made arrangements with the United States marshal to pay a deposit for the estimated initial expenses and costs of, *inter alia*, seizing, transporting, storing, and keeping the attached property, and **(2)** Mr. Woodward has the financial ability to periodically pay in advance the future estimated expenses of maintaining custody of the property until the conclusion of this litigation. The Court will require a showing of actual dollar amounts of the estimated expenses and costs and Mr. Woodward's ability to pay. The marshal shall determine the services and the items of costs and expenses that are appropriate for executing the writ and maintaining custody of the attached property.

**Undertaking.** The Court will not issue the requested writ of attachment with an undertaking in the amount of only $2,500. No explanation of the calculation of this proposed amount was provided, specifically no showing of how it meets the likely or possible damages that the Algies might sustain if these proceedings are found to be wrongful and oppressive. Ind. Code § 34-25-2-5. The Court would set the amount of the undertaking to cover at least **(1)** the potential losses and damages, direct and consequential,

9

suffered by the Algies if their property is seized and **(2)** the costs and expenses that the marshal would incur to return the property to the Algies. Mr. Woodward must show estimates for both components and his method of estimation. Mr. Woodward must confer with the marshal regarding the costs and expenses to return seized property to the Algies and the marshal will determine those costs and expenses.

**Grounds.** Mr. Woodward has not shown grounds for attachment under Ind. Code § 34-25-2-1. Ind. Code § 34-25-2-4(4). As noted above, he argues that attachment is justified under § 34-25-2-1(b)(4), (5), and (6).

**a. Paragraph (b)(4).** This paragraph requires a showing that the Algies are removing or about to remove executable property outside of Indiana and not leaving enough in Indiana to satisfy Mr. Woodward's claim.

Mr. Woodward or a person representing him was required to make an affidavit showing "the amount that the plaintiff ought to recover." Ind. Code § 34-25-2-4(3). Neither Mr. Woodward's affidavit, his *Petition*, nor his *Complaint* identifies a total amount that he claims he should recover in this action. All state that Mr. Woodward paid $475,176.00 toward the LP1 project. But the *Petition* also states that the Algies' conduct has caused damages to Mr. Woodward, "including a substantial economic loss in an amount not less than $475,176.00 plus any and all lost future profits from both the LP1 Pre-Sales and all future sales of the LP1 and Rebranded LP1, including, without limitation, revenue

generated in relation to the LP1 Project and its progeny." *Petition* at 14. No amount of lost profits and sales is identified or suggested. Because the only specific amount of possible damages identified is the $475,176.00 total of Mr. Woodward's payments, the Court can consider only this figure as the total amount that Mr. Woodward ought to recover.

Mr. Woodward has made no showing that the Algies have removed or are about remove any of their property subject to execution outside of Indiana or that there is, or will be, an insufficient amount of their property, that is now subject to execution in Indiana, to satisfy a judgment in the amount of $475,176.00. Mr. Woodward alleges that the Algies are soliciting pre-sales for future LP1 kits and have successfully lobbied all of Mr. Woodward's pre-sale customers to demand refunds of their deposits in favor of entering pre-sale agreements with the Algies. Mr. Woodward has identified no pre-sales actually accomplished by the Algies, no deposits that they have received, and he has identified no currently executable property that has been transported out of Indiana as a result of any pre-sales, let alone the value of any executable property that has been transported out of the state. There is not even evidence that Mr. Algie has completed the LP1 prototype, has obtained flight certification for it, or has begun production of any finished, saleable kits.

Mr. Woodward's only argument in support of his assertion that the Algies' remaining executable property might not satisfy a judgment is the fact that they claim to not have resources to pay for counsel and have solicited donations to a legal defense fund. But this does not show that they do not, in fact, have enough property subject to execution,

but only that their property is not readily liquid or that they do not choose to liquidate property to pay for a defense in this case. Mr. Woodward presents no evidence or allegation of the value of the Algies' real or personal property or, specifically, the value of the assets (*e.g.*, machines, equipment, buildings, supplies, materials) related to the LP1 project that he wants attached. Mr. Woodward makes no showing or suggestion that the Algies are selling any of their personal assets or LP1-related assets or have removed them outside the state. There is no basis for the Court to find that the Algies have or will have insufficient assets to satisfy a $475,000.00 judgment. Furthermore, there is no showing that attachment of the property identified in the *Proposed Order* would either prevent pre-sales of future LP1 kits by the Algies or assure the availability of executable property sufficient to satisfy a $475,176.00 judgment.

    **b. Paragraphs (b)(5) and (6).** To qualify under these paragraphs, Mr. Woodward must show that the Algies have sold, conveyed, or otherwise disposed of, or are about to sell, convey, or otherwise dispose of, their executable property with the fraudulent intent to cheat, hinder, or delay Mr. Woodward — without regard to the sufficiency of their remaining executable property. Mr. Woodward's only argument in support is that, if the Algies do convey the property identified in the *Proposed Order* it "would be with the fraudulent intent to cheat, hinder or delay . . . Woodward's recovery of its claims in this matter." *Petition* at 13. The Court cannot simply assume fraud on the part of the Algies. In addition, fraud must be shown on both the Algies' and their purchasers' parts, *Johnston*

*v. Field*, 62 N.E. 377 (Ind. 1878), and Mr. Woodward has not shown a shared fraudulent intent to cheat, hinder, or delay on the part of any purchaser or potential purchaser from the Algies.

Mr. Woodward has not shown grounds under Ind. Code § 34-25-2-1(b)(4), (5), or (5) for a writ of attachment against the property of the Algies.

**Property to be attached.** The *Proposed Order* directs the sheriff to attach "any and all items, parts, plans, equipment and other items, tangible or intangible, used and/or otherwise associated with the development, fabrication and building of that certain aircraft and/or aircrafts referred to as the LP1, the ACA3 and/or otherwise known by any other designation, in the possession and/or control of the Algies, and/or any agent thereof, located anywhere within the State of Indiana . . . (the "Subject Property")." *Proposed Order* ¶ 1. This is an order for replevin of specific property, not attachment. An attachment is available in an action for the recovery of money. Ind. Code § 34-25-2-1(b). The plaintiff must aver the amount of damages that he ought to recover, *id.* § 34-25-2-4(3), and the sheriff (or marshal) seizes only the amount of property, by value, to satisfy the plaintiff's averred claim, beginning with personal property, *see id.* § 34-25-2-11(b); § 34-25-2-9(2). A plaintiff petitioning for attachment does not identify specific goods to be seized and taken by the sheriff because the purpose of attachment is only to ensure that property, any property, will be available to satisfy a money judgment; it is not to preserve the availability of specific items of property for recovery by the plaintiff. In addition, although the *Proposed*

*Order* also includes an order to the Algies to not secret, remove, destroy, or damage the identified Subject Property or any documents, materials, components, parts, and/or accessories related to the Subject Property, *Proposed Order* ¶ 5, such an order would not assure satisfaction of a money judgment without a showing of the expected value of the identified property, which Mr. Woodward does not supply.

It is apparent that the purpose of the *Petition* is not to ensure that enough property of the Algies is available for execution to satisfy a money judgment in Mr. Woodward's favor, but to ensure that the LP1 project — the prototype, technology, plans, equipment, materials, intellectual property, *etc.* — is preserved and available for recovery by him. In fact, Mr. Woodward asserts that, in addition to his marketing rights under the *Agreement*, he is the owner of the LP1, *Affidavit of Loyd Woodward* (October 24, 2013) [doc. 26-30] ("*Second Woodward Affidavit*") ¶ 23; the Algies are attempting to sell the LP1, "which is property that belongs to Woodward," *Petition* at 10, ¶ 23; and, without the writ of attachment, there is a threat that the Algies' possible transactions "will deny Woodward the ability to recover the Subject Property," *Petition* at 13. But this suit is not about recovering any property from the Algies; it is about recovering money damages and a writ of attachment serves only that interest. Mr. Woodward has made no claim for replevin and no request for a declaratory judgment declaring ownership of the LP1-related property.

Therefore, if a writ of attachment were to issue, it would direct only that the U. S. marshal seize and take custody of enough property owned by the Algies that would satisfy

a judgment of $475,176.00, regardless of its relationship to the LP1 project. The marshal would use his discretion to determine which property to seize and, in making that determination, he may consider factors such as the ease and expense of seizure, transportation, storage, risk of damage during storage and execution, and proceeds on execution. In light of these factors, the seizure and storage of a prototype aircraft incorporating novel technology, for example, might not rank high on the marshal's preferences.

## Conclusion

Mr. Woodward's *Ex Parte* Petition for Pre-judgment Writ of Attachment [doc. 26] is **DENIED**. Mr. Woodward is **ORDERED** to file a notice with the Court, within seven days of the date of this Entry and Order, whether he intends to file a new petition for writ of attachment and when he can have it on file. **If he does not so notify the Court or he intends not to file a renewed motion, then the *ex parte* restrictions on the *Petition*, this Entry and Order, and related filings will be lifted**.

**SO ORDERED this date:** February 14, 2014.

**Reissued for publication this date:** 04/14/2014

_____
Denise K. LaRue
United States Magistrate Judge
Southern District of Indiana

Distribution:

    Plaintiff's counsel.

    United States Marshal (special direction)