# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA,
### INDIANAPOLIS DIVISION

LOYD WOODWARD,

      **Plaintiff,**

    *vs.*

DAVID ALGIE and LINDA ALGIE,

      **Defendants.**

**CAUSE NO.  1:13-cv-1435-DKL-RLY**

## ENTRY

*Plaintiff's Motion for Summary Judgment* **[doc. 149]**

*Plaintiff's Motion for Leave To Supplement Exhibit "NN" to Motion for Summary Judgment* **[doc. 197]**

Plaintiff Loyd Woodward moves for summary judgment on counts 1 (breach of contract), 2 (breach of fiduciary duties and usurpation of business opportunities), and 3 (tortious interference) of his *Verified Amended Complaint for Damages and Injunctive and Other Equitable Relief* [doc. 118] ("*Complaint*"),[1] and on defendants David and Linda Algie's sole remaining counterclaim, for promissory estoppel, *Counter Complaint* [doc. 122] ("*Counter Complaint*"), § IV "First Cause of Action."[2]  In addition to opposing Mr. Woodward's motion for summary judgment, the Algies ask that summary judgment be

---

[1] Mr. Woodward's filings on the present motion occasionally mistakenly refer to his tortious-interference claim as Count 5.

[2] In its *Entry and Order* of October 19, 2015, [doc. 165], the Court dismissed the Algies' remaining counterclaims, except the one for promissory estoppel, and it struck their *Amended Counter Complaint* [doc. 148], leaving their *Counter Complaint* as the operative pleading of their counterclaim for promissory estoppel.

1

granted in their favor on those claims and on the rest of Mr. Woodward's claims. *Defendant David and Linda Algie's Supplemental Memorandum of Law in Support of Their Opposition to Plaintiff's Motion for Summary Judgment* [doc. 202] ("*Algies Supp. Brief*"), at 2.

The Algies filed their response to Mr. Woodard's motion while proceeding *pro se*. *Defendants Counter Motion to Plaintiffs Summary Judgment Motion* [doc. 162] ("*Response*").[3] After Mr. Woodard filed his reply, *Reply Brief in Support Plaintiff's Motion for Summary Judgment etc.* [doc. 170] ("*Reply*"), and the Algies filed their surreply, *Defendants Response to Plaintiffs MSJ Reply and Response Brief* [doc. 174] ("*Surreply*") (Nov. 9, 2015), the Court invited and granted the Algies' request for recruitment of counsel, *Entry Regarding request for counsel* [doc. 176] (Nov. 23, 2015); *Entry* [doc. 180] (Dec. 16, 2015), and recruited *pro bono* counsel for them, *Entry Requesting Appearance of Civil Trial Assistance Panel Counsel* [doc. 181] (Jan. 20, 2016); [docs. 182, 183].  The Court scheduled oral argument on Mr. Woodward's motion and notified the parties that the hearing was limited to argument; no new evidence was anticipated.  *Minute Entry, Telephonic Pretrial Conference, February 2, 2016* [doc. 187]; *Entry* [doc. 192] (Feb. 22, 2016).  Oral argument was heard from Mr. Woodward's counsel and recruited *pro bono* counsel for the Algies on February 23, 2016. *Entry from the Oral Argument* [doc. 198].  The parties filed post-hearing supplemental briefs.  *Woodward's Post-hearing Brief in Support Plaintiff's Motion for Summary Judgment*

---

[3] Based on the Algies' subsequent representations, the Court construed this filing as only a response and not also a counter-motion for summary judgment.  *Entry and Order* [doc. 175] (Nov. 16, 2015).

[doc. 203] ("*Woodward Supp. Brief*"); *Algies Supp. Brief.*   On these submissions and presentations, the matter is ready for decision.

## Evidentiary record

Both sides ask that certain exhibits not be considered.   Mr. Woodward objects to the Algies' *Response* Exhibits 11 through 21 [docs. 162-11 through 162-21], which are copies of e-mails and one letter, Exhibit 15 [doc. 162-15], from individuals attesting to the Algies' character and Mr. Algie's skills.   Because none of these statements constitute sworn affidavits, conform to the requirements for declarations provided in 28 U.S.C. § 1746, or otherwise indicate that they can be presented in admissible form, they are not qualified evidence and are not considered on the present motion.   *Widmar v. Sun Chemical Corp.*, 772 F.3d 457, 460 (7th Cir. 2014), *cert. denied*, 135 S.Ct. 2892 (2015); S.D. Ind. L.R. 56-1(e) ("A party must support each fact the party asserts in a brief with a citation to a discovery response, a deposition, an affidavit, or other admissible evidence."); *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 434-35 (7th Cir. 2013); *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009); *Article II Gun Shop, Inc. v. Gonzales*, 441 F.3d 492, 496 (7th Cir.2006) ("To be admissible, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence.").   At oral argument, through a demonstrative exhibit, the Algies conceded that these exhibits are not admissible.   At any rate, the *Response* does not refer to any of these exhibits.

Mr. Woodward also argues that the *Response*'s Exhibits 2 through 5, 7, 8, and 10 [docs. 162-3 through 162-6, 162-8, 162-9, and 162-10] are inadmissible. Exhibits 2 through 5, and 10 appear to be copies of e-mails, but they lack authenticating affidavits or declarations, which renders them inadmissible. Exhibits 7 and 8 purport to be the first pages (only) of itemizations of payments made by Mr. Woodward to support the LP1 project (for "Product Development" and "Parts and Fuel", respectively) and they correspond to Mr. Woodward's Exhibits N [doc. 149-14] and O [doc. 149-15] that are attached to his present motion, *Plaintiff's Motion for Summary Judgment* [doc. 149] ("*Motion*"). Because neither Mr. Woodward nor the Algies support the admissibility of these exhibits with authenticating affidavits or declarations, they are inadmissible.

Finally, Mr. Woodward moves to strike the *Response*'s Exhibit 22 [doc. 162-22], a fifteen-page narration by Mr. Algie of facts, conclusions, assumptions, and suspicions related to this case, titled "The Woodward Plan." Although the Algies have filed this narration a few times in this case, including as an attachment to their since-stricken *Amended Counter Complaint* [doc. 148-5], it bears no signatures, date, or any other indicia of an affidavit or declaration. Thus, it does not constitute evidence that may be considered on the present motion.

The Algies argue that several of Mr. Woodward's exhibits are inadmissible. They specifically argued against the admissibility of Exhibits AA, BB, CC, HH, II, JJ, and NN. Exhibit AA [doc. 149-27] appears to be a copy of an e-mail chain. Exhibit BB [doc. 149-28] is a list titled "PRE-SALE CUSTOMERS." Exhibit CC is a form agreement titled

4

"ALGIE COMPOSITE AIRCRAFT" / "WAIVER AND LIMITED WARRANTY AGREEMENT."  Exhibit Exhibits HH and II [docs. 149-34, 149-35] appear to be copies of two pages of advertisements from a trade publication that include advertisements or articles regarding the LP1.  None of these documents is accompanied by an authenticating or attesting affidavit or declaration and, therefore, do not constitute admissible evidence.

Exhibit JJ [doc. 149-36] appears to be an image of a webpage from the Marion County Assessors office showing an assessment of the Algies' residence.  The only possible authentication of this document appears to be in Mr. Woodward's third "affidavit," Exhibit NN [doc. 149-40], ¶ 16.  However, because Exhibit NN is excluded for the reasons discussed below, Exhibit JJ is not authenticated and, thus, does not constitute admissible evidence.  (The exhibit might, in fact, be a mistake because the index of exhibits in the *Motion* describes it as "LP1 FAA Registration."  *Motion*, at 2.)

In a demonstrative exhibit used at oral argument, the Algies also objected to Exhibits D through I, K through U, X, DD, FF, GG, KK through NN, and QQ.

Exhibits D through I [docs. 149-4 through 149-9] purport to be declarations of six individuals and are signed and dated and bear the location where signed.  However, the documents are not affidavits, because they do not show that the individuals "[swore] to the content in the presence of someone authorized to administer oaths," *Owens v. Hinsley*, 635 F.3d 950, 954-44 (7th Cir. 2011), and they are not declarations because they fail to state that they are "true and correct" and made "under penalty of perjury."  28 U.S.C. § 1746.

Exhibits K through U [docs. 149-11 through 149-21] purport to be a series of lists of expenses paid by Mr. Woodward to support the LP1 project.  Exhibit DD appears to be a copy of a "LP1 Kit Deposit Refund" document.  Not being authenticated or attested by affidavit or declaration, they are not admissible evidence.

Exhibit X [doc. 149-24] purports to be an image of a page on a fundraising website, titled "Woodward lawsuit defense fund."  Exhibit FF [doc. 149-32] appears to be copies of Indiana Code chapter 34-25-2, pertaining to writs of attachments.  Exhibit GG [doc. 149-33] purports to be an image of the result of a business-name search on the Indiana Secretary of State's website.  Exhibit KK [doc. 160] appears to be images of "David Algie's Page" on the "PatriotAction Network" website.  Exhibit LL [doc. 160-1] purports to be a list of the values of assets used in the LP1 project.  Exhibit MM [doc. 149-39] purports to be a copy of a rule promulgated by Indiana's Department of Financial Institutions that establishes execution exemption limits.  Because none of these exhibits are authenticated or attested by affidavits or declarations, they are not admissible evidence.

Mr. Woodward submitted Exhibit QQ [docs. 169-1, 170-1] with his *Reply*.  It consists of the affidavit and report of Ronald D. McElroy, who assessed the LP1 for potential flight certification and airworthiness on August 22, 2012, on request of Mr. Woodward.  The affidavit, dated October 28, 2015, was prepared for the reply.  His "Test Pilot Report" bears the date that the test was performed and, without any showing to the contrary, the Court assumed the Mr. McElroy produced his report at or soon after that date as well.  In a demonstrative exhibit at the oral argument, the Algies objected that this

6

exhibit was an untimely expert report because it was tendered after the expert-disclosure deadline. The objection was not argued at the hearing or in the *Algie's Supp. Brief.*

Mr. Woodward's deadline for disclosing his experts and serving their reports was June 1, 2015, *Amended Case Management Plan* (July 14, 2015) [doc. 144], § III.F., unless he intended to use that expert testimony in connection with his summary-judgment motion, in which case his deadline was ninety days before the dispositive-motions deadline of August 17, 2015, *i.e.*, on or about May 17, 2015, *id.*, § III.G.; *Order* [doc. 146]. The Algies did not state when, or if, Mr. Woodward made his Rule 26 disclosure of Mr. McElroy as an expert and the subjects of his opinions. Mr. Woodward did not include any expert witness on his preliminary witness lists, *Plaintiff's Preliminary Witness and Exhibit List* (July 17, 2014) [doc. 106]; *Plaintiff's Preliminary Witness and Exhibit List* (June 2, 2014) [doc. 102], but he noted, on his July, 2014, list "Experts unknown at this time, but we do anticipate having to hire one to help prove damages." His *Final Witness and Exhibit List* (Sept. 1, 2015) [doc. 154] lists Mr. McElroy as "Fact Witness / Expert Witness (Report Completed Aug. 22, 2012)" and his testimony as "Regarding the relationship between Woodward and the Algies, the LP1 Project, Certification Requirements and Airworthiness." If Mr. Woodward did not disclose Mr. McElroy as an expert witness before his deadline, then his testimony might be inadmissible. However, the Court has no showing before it that Mr. McElroy was not timely disclosed. Thus, Exhibit QQ is admissible evidence for the purposes of the present motion.

Finally, at the oral argument, the Algies objected to Exhibit NN [doc. 149-40], the "Third Affidavit of Loyd Woodward," because it is unsigned.  Mr. Woodward quickly moved for leave to substitute a signed signature page.  *Plaintiff's Motion for Leave To Supplement Exhibit "NN" to Motion for Summary Judgment* [docs. 197, 197-2].  It appears that Mr. Woodward's third "affidavit" originally was filed in March, 2014, in support of his third *ex parte* attempt to attach property related to the LP1 project.  *Revised* Ex Parte *Petition for Pre-judgment Writ of Attachment* [doc. 70], Exhibit NN [doc. 70-40].  That one is also unsigned because counsel explained that he did not receive the signed signature page in time for filing.[4]  He states that he mistakenly filed that original unsigned version with the present motion and seeks leave to substitute the signature page that he received in March 2014.  The Algies oppose the request.  Mr. Woodward's motion is denied, first, because the time to submit evidence has passed and, second, even with the tendered signature page, the third "affidavit" is not sworn before a person authorized to administer oaths and, therefore, is not an affidavit, and it lacks a date of execution and, therefore, is not substantially in the form required by 28 U.S.C. § 1746.  Mr. Woodward's motion for leave to supplement Exhibit NN [doc. 197] is denied.  Without a signature and not qualifying as an affidavit or declaration, Exhibit NN is not admissible evidence.

---

[4] Counsel's March, 2014, request for an extension of time to substitute the signed signature page was denied.  *Entry* (March 21, 2014) [doc. 72], at 5.

Therefore, the evidence forming the factual record on Mr. Woodward's motion for summary judgment consists of the following:  Woodward's exhibits A, B, C, J, V, W, Y, Z, EE, OO, and PP; and the Algies' exhibits 1 and 9.

## Discussion

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Familiarity with the facts and allegations is presumed and have been described in previous entries and orders.  This Entry states for the record the reasons for the Court's decisions on Mr. Woodward's *Motion*. *Id.*

**The contract.**  Mr. Algie, who had long experience in Indy-car design, worked for at least twenty years on developing a light-weight, carbon-fiber kit aircraft that a purchaser could assemble himself.  He named it the "LP1," for "light plane 1."  He came into contact with Mr. Woodward, who is in the business of selling aviation-related equipment, including airplanes and/or airplane products.  The two discussed financing and Mr. Woodward's involvement in Mr. Algie's LP1 project.[5]  Mr. Woodard drafted and, on December 30, 2009, the parties signed, a document titled "Contract Agreement" that reads, in full, except for date and signature lines (bracketed paragraph designations added):

---

[5] The parties disagree on who approached and/or solicited whom and on the content of their discussions.

**[¶ 1]** The purpose of the contract is to facilitate the completion of the David Algie's Light Plane 1 hence named the LP1. This will simply be referred to as the Agreement.

**[¶ 2]** Parties to this contract are David Algie, Linda Algie, and Loyd Woodward a single man.

**[¶ 3]** David Algie will receive from Loyd Woodward the sum of $7000.00 per month for one year. This will be used for support of David Algie so that he can devote his efforts to complete the LP1 to the point of flight certification.

**[¶ 4]** Loyd Woodward will receive from David Algie the right to exclusively market the LP1 and its technology. It is understood that David Algie may have sold up to 5 kits already and these will not be subject to this agreement. For an additional sum of $40,000.00 Loyd Woodward will have purchasing rights of an LP1 for his individual use.

**[¶ 5]** Loyd Woodward will also receive the rights to commercially market all improvements, inventions, and/or discoveries made during the development of the LP1, whether patentable, copyrightable or not. Loyd Woodward reserves the right to assign these rights to a business entity. These rights shall be joint property of David Algie and Loyd Woodward. Should unforeseen circumstances prevent David Algie from completing the project within 24 months then Loyd Woodward has the obligation and right to commercially market all properties regarding the LP1 now in custody of David Algie.

*Contract Agreement*, Woodward Exhibit A [doc. 149-1], Algies Exhibit 1 [doc. 162-2] ("*Contract*").

After the *Contract* was executed, Mr. Algie quit his sixteen-year-long employment with an Indy-car team and a twenty-seven career in the auto-racing industry and devoted himself full-time to the LP1 project. Mr. Woodward paid $7,000 to Mr. Algie each month for one year. He continued to pay this monthly amount after the twelve-month period expired and he made additional payments to support the development of the LP1. Some

of these extra payments were made to Mr. Algie and some were made by Mr. Woodward directly for supplies, equipment, materials, parts, fuel, travel, and other items.  He also paid for individuals to assist Mr. Algie.  Mr. Woodward alleges that these extra-contract payments total a little over $475,000.  Mr. Woodward solicited and received pre-sales orders for LP1 kits from sixteen customers, each of whom paid a deposit which was collected and held by Mr. Woodward.  In total, Mr. Woodward collected approximately $75,000 of deposits.

The LP1 prototype has yet to be flight-certified and, certification being a prerequisite, the production and sale of kits has not commenced.  The parties' relationship eventually soured, culminating in Mr. Woodward ceasing all financial support for the LP1 project, and Mr. Algie asserting that he ceased their contractual relationship entirely, in October, 2012.  The parties disagree about who ended the financial support: Mr. Woodward alleges that, after Mr. Algie had failed to complete the LP1 project months after the two-year term of the *Contract* and despite substantial extra-contract payments, he ended the financial support by giving Mr. Algie written notice thereof on October 22, 2012, which letter also advised that Mr. Woodward would "become only the sales force as originally agreed."  *October 22, 2012 Woodward-Algie Letter*, Woodward Exhibit OO [doc. 149-41] ("*Termination Letter*").  Mr. Algie alleges that, three days earlier, on October 19, 2012, after months of an increasingly hostile and difficult relationship with Mr. Woodward and after a particularly hostile encounter with him on that day, Mr. Algie ended the relationship with him, telling him that he would no longer

11

accept any funding from him.  *Counter Complaint*, ¶¶ 20 and 21.  Mr. Algie alleges that, on October 22, 2012, after he refused Mr. Woodward's requests to reconsider, Mr. Woodward gave him the *Termination Letter*.  *Id.*, ¶ 21.  Mr. Algie alleges that he not only ended Mr. Woodward's extra-contractual financial support of the LP1 project but ended their contractual relationship entirely.  Mr. Woodward contends that the *Contract* continues, particularly his marketing rights, and only his additional financial support ceased.

In May, 2013, Mr. Woodward filed this suit against the Algies in the Northern District of Texas, Mr. Woodward's domicile.  The case was transferred to this Court in September, 2013.

While the parties agree that the *Contract* is a binding contract under Indiana law, they disagree about the meaning of its terms and whether and what additional agreements were made outside of the *Contract*.  In a nutshell (to be fleshed out in the discussion below), Mr. Woodward contends that the parties agreed on the following terms:  **(1)** to form a 50/50 partnership in the LP1 project; **(2)** Mr. Algie would produce a finished, flight-certified LP1 prototype no later than two years after execution of the *Contract*; **(3)** Mr. Woodward had  exclusive and joint rights to market and sell the LP1, in return for a commission of 20% of the sales price for each kit sold; **(4)** Mr. Woodward had the right to purchase an LP1 kit for $40,000; and **(5)** if Mr. Algie failed to complete the LP1 prototype within two years, then Mr. Woodward had the right to "take over" and sell everything related to the LP1 project (including intellectual property) or to have it

12

completed by someone else, as a means to recover his contractual and extra-contractual payments and his commissions.[6]

According to Mr. Algie, the parties made a simpler agreement:  Mr. Woodward agreed to provide monthly payments of $7,000 to Mr. Algie for one year and, in return, he received:  **(1)** the right to purchase an LP1 kit for $40,000; **(2)** Mr. Algie's promise to devote his full-time effort to complete the LP1 prototype to the point of flight certification; **(3)** the exclusive right to market, not sell, the LP1 kits and its technology; **(4)** the joint right, with Mr. Algie, to market, not sell, any improvements, inventions, and/or discoveries made during the development of the LP1;[7] and, **(5)** if unforeseen circumstances prevented Mr. Algie from completing the LP1 prototype to the point of flight certification, then Mr. Woodward had the obligation and the right to commercially market, not sell, all properties relating to the LP1 project.  According to Mr. Algie, the parties did not agree to form a partnership or to allow Mr. Woodward a commission on any LP1 kits sold (or pre-sold) as a result of his marketing.  Mr. Woodward's direct monetary consideration for paying Mr. Algie $84,000 over one year was the option to

---

[6] Although not stated explicitly, presumably Mr. Woodward contends that, if he did not cause the LP1 project to be completed, through to the production and sale of kits, he would liquidate the LP1 project's assets and first recover his extra-contract payments and unpaid commissioners, from the proceeds and then split any remaining profits 50/50 with the Algies.

[7] How the "improvements, inventions, and/or discoveries made during the development of the LP1" in ¶ 5 of the *Contract*, to which Mr. Woodward and the Algies had joint marketing rights, relate to "the LP1 and its technology" in ¶ 4 of the *Contract*, to which Mr. Woodward had exclusive marketing rights, has not been addressed by the parties.  Possibly, the "improvements, inventions, and/or discoveries" of ¶ 5 means technology that emerged during the development of the LP1 that did not ultimately become part of the LP1.

purchase an LP1 kit for $40,000.  According to Mr. Woodward, the price for each kit was at least three times more; thus, the savings far exceeding Mr. Woodward's $84,000 of monthly payments.  *Complaint,* ¶¶ 39, 48, 54, 55, 60.  See also *Defendants' Motion To Dismiss and Counter Complaint,* Exhibit 5 [doc. 27-5].[8]  Mr. Woodward's consideration also included Mr. Algie's promise to devote his efforts to completing the LP1, exclusive and joint rights to market the LP1 and its related technology and inventions, and a contingent right to market the LP1 properties after two years.

The parties did not directly address the status of Mr. Woodward's $450,000 of extra-contractual payments.  There is no allegation that the parties reached any agreement or contract regarding these amounts.  Based on Mr. Woodward's assertion that the parties formed a partnership, it can be assumed that he believes that his extra-contractual payments for the LP1 project were partnership contributions to the partnership.  Based on the Algies' assertion that no partnership was formed, presumably they believe that Mr. Woodward's extra-contractual payments were voluntary payments.

Because the parties do not dispute that the *Contract* is a valid contract, the Court will assume that it is for the purpose of the present motion.

---

[8] This list, complied by the Algies, shows the pre-sales they made after the break with Mr. Woodward.  Of the 17 listed pre-sale customers, 16 had originally placed their orders and deposits with Mr. Woodward before the parties' break, but they cancelled their orders and received back their deposits after the break.  The Algies apparently gave these customers the same prices, terms, and order of priority in receiving kits on production that they had with Mr. Woodward.  The list shows 3 kits pre-sold for $125,000 each, 1 kit for $145,000, and 11 kits for $150,000 each, for an average price of $145,000 per kit.

**1. Mr. Woodward's Count 1, breach of contract.**   Mr. Woodward alleged in his *Complaint* that the Algies breached the *Contract* in the following ways:  **(1)** they failed to produce and/or finalize the LP1 by the contract term of twenty-four months, *Complaint*, ¶ 68, and **(2)** they interfered with his exclusive marketing and sales rights under the contract by **(a)** encouraging his pre-sale customers to cancel their orders for LP1 kits and to place replacement orders directly with the Algies , *id.*, ¶ 69; **(b)** directly marketing and selling LP1 kits to customers, *id.*, ¶ 70; and **(c)** "rebranding" the LP1 (to the "ACA3") and converting the project for their own benefit and use, thereby excluding Mr. Woodward from his marketing rights and commissions, *id.*, ¶ 71.

In his present motion for summary judgment, Mr. Woodward moves for summary judgment on the following breaches of the contract:  **(1)** after failing to complete the LP1 project within the contract term of twenty-four months, the Algies refused to turn over rights in the LP1 project to Mr. Woodward so that he could commercially market all the assets associated with the LP1 project, *Motion*, at 11; **(2)** violating Woodward's marketing and sales rights by marketing and soliciting sales on their own and through a new sales agent, *id.*; and **(3)** failing and refusing to produce an LP1 for Woodward to purchase at the agreed discount price, *id.*, at 13.

**Failing to complete the LP1 in two years.**  "Upon reviewing the provision of a contract, we will determine the parties' intent from the four corners of the contract.  If the contract language is clear and unambiguous, we will give the language its plain and ordinary meaning." *Dept. of Correction v. Swanson Services Corp.*, 820 N.E.2d 733, 737 (Ind.

Ct. App. 2005) (citations omitted), *trans. denied*.  As noted above, Count 1 of the *Complaint* claims that the Algies breached the *Contract* by not "producing and/or otherwise finalizing the LP1." *Complaint*, ¶ 68.[9]  The *Complaint* alleges that the Algies represented, promised, and agreed to "finalize the LP1 for production, marketing, and sale." *Id.*, ¶¶ 21, 25.  However, Mr. Woodward, neither in the *Complaint* nor in his *Motion*, identifies any promise by the Algies in the *Contract* to complete or finalize the LP1, by any deadline or at all.  At the oral argument, Mr. Woodward's counsel conceded that Mr. Algie did not guarantee that the LP1 would be done in twenty-four months or by any deadline.  *Oral Argument* (recording) at 2:35:55 to 2:37:21.  According to the plain meaning of the language of the *Contract*, Mr. Algie agreed only to "devote his efforts" to complete the LP1 to the point of flight certification.  *Contract*, ¶ 3.  There is no allegation and no evidence that Mr. Algie did not devote his efforts to completing the LP1 to the point of flight certification.  At oral argument, Mr. Woodward's counsel stated that Mr. Woodward believes that Mr. Algie was trying to get the project done.  *Oral Argument* at 2:35:55 to 2:36:18.

---

[9] The next paragraphs of the *Complaint* indicate that Mr. Woodward intended to claim that the failure to complete the LP1, alone, was a breach of the *Contract*.  *Complaint*, ¶ 69.  Although his *Motion* appears to drop the failure to complete the LP1 as a separate claim, and incorporates it into his claim of failure and refusal to turn over the LP1 properties to Mr. Woodward for marketing and sale, the Court addresses the *Complaint*'s independent claim for completeness.

Therefore, to the extent that Mr. Woodward requests a summary judgment in his favor that the Algies breached the *Contract* by failing to complete or finalize the LP1, the request is denied.

**Refusing to turn over rights in the LP1 to Mr. Woodward.**   Mr. Woodward seeks summary judgment on his claim that the Algies breached the *Contract* by "refusing to turnover rights in the LP1 project to Woodward so that Woodward could commercially market the LP1 Assets" after the Algies failed "to complete the LP1 Project within the Term . . . ."  *Motion*, at 11.  Mr. Woodward argues that "[p]ursuant to the terms of the Contract, if David failed to complete LP1 Project within the Term, then Woodward was entitled to retake and commercially market all properties regarding the LP1."  *Id.*

Paragraph 5 of the *Contract* provides:  "Should unforeseen circumstances prevent David Algie from completing the project within 24 months then Loyd Woodward has the obligation and right to commercially market all properties regarding the LP1 now in custody of David Algie."   *Contract*, ¶ 5.  The parties disagree over the meanings of "completing the project," "unforeseen circumstances," and "market," and they disagree about whether Mr. Algie, in fact, completed the project and, if not, whether unforeseen circumstances prevented him from doing so.

Mr. Woodward argues that, under ¶ 5 of the *Contract*, he had the right to market all LP1 property if Mr. Algie "failed to complete LP1 Project within the Term."  *Motion*,

at 4.[10]  Citing Mr. Algie's declaration and deposition, Mr. Woodward asserts that, by the

*Contract*, Mr. Algie agreed to devote his full-time efforts to constructing a light airplane

kit prototype which later could be mass marketed for sale.  *Id.*, at 3 (citing *Algie Declaration*

[doc. 149-2], ¶ 2, and *David Algie Deposition* [doc. 160-2] ("*Algie Deposition*"), at p. 274, ll.

14-17).  The term "LP1" meant the prototype aircraft and the "LP1 project" meant the

development, fabrication, and building of the prototype.  *Motion*, at 3.  Mr. Woodward

apparently argues that "completing the project" in ¶ 5 means "to finalize the LP1 and

have same ready for production and sale within the Term" or "to finalize and produce a

single LP1 [prototype]."  *Id.*, at 5.

Mr. Algie contends that "completing the project" in ¶ 5 of the *Contract* means "to

complete the LP1 to the point of flight certification," as described in ¶ 3, and that this

means that the prototype is ready to begin the process of flight certification.  *Counter*

*Complaint*, ¶ 19; *Response*, at 2 ("But the 'Point of certification' meant that the LP1 was

ready for certification to start, not even that the DAR [designated airworthiness

representative] had even visited yet.").

The *Contract* states that "[t]he purpose of the contract is to facilitate the completion

of the . . . Light Plane 1" and that Mr. Woodward's payments of $7000 per month for one

year are "for support of David Algie so that he can devote his efforts to complete the LP1

---

[10] Mr. Woodward defines the "Term" to mean "the twenty-four (24) month term of the Contract
(the 'Term')."  *Motion*, at 3.

to the point of flight certification." *Complaint*, ¶¶ 1, 3. Paragraph 5's phrase "completing the project" is the only use of the word "project" in the *Contract*. The Court concludes that "the project" means "the LP1," the prototype, and that "completing the project" means "completing the LP1 to the point of flight certification," which the *Contract* states is the purpose of Mr. Woodward's monthly financial support to Mr. Algie, *Contract*, ¶ 3. The Court finds that this is the most natural and plain meaning of the language and the one that harmonizes and is consistent with the language of the *Contract* as a whole. If there is a significant practical difference (which the parties did not address) between completing a prototype "to the point of certification" and to the point at which "production and sale" of kits is ready to begin, then the Court concludes that the former is the meaning of paragraph 5's term "completing the project," the prevention of which, due to unforeseen circumstances, triggers Mr. Woodward's right to commercially market all properties regarding the LP1, the prototype.

However, the *Contract* also does not define what "to the point of flight certification" means. As noted, the Algies contend that it means that the prototype is ready for the flight-certification process to begin, not that the process actually begins or is successfully completed. Mr. Woodward does not declare a clear position on what the phrase means. From his argument (discussed below) that, contrary to the Algies' allegation, the LP1 has never been ready for flight certification to begin because a DAR in 2012 suspended his flight-certification inspection at the taxiing stage after finding the prototype to be unsafe and not airworthy, it fairly can be assumed that Mr. Woodward

19

contends that "to the point of flight certification" means, at least, that a prototype advance beyond the taxiing stage of inspection and proceed to in-flight testing.  However, based on Mr. Woodward's interpretation that "completing the project" means that production and sale of kits is ready, the Court assumes that Mr. Woodward contends that "to the point of flight certification" means that a prototype has successfully passed inspection and been flight certified.  *See Woodward Supp. Brief*, at 15.

Neither side presented evidence indicating whether the parties' pre-*Contract* discussions touched on the meaning of the phrase "to the point of flight certification" or statistical evidence regarding flight certifications of new kit aircraft (*e.g.*, how often issues that prevent certification are discovered, the time it usually takes to correct such issues, and, on average, the time to achieve certification) that might have offered some reasonable support for one interpretation over another.  The Court finds that both sides' interpretations are reasonable.  As such, the Court finds that the phrase "to the point of flight certification" is ambiguous and, because Mr. Woodward drafted the *Contract*, the Court interprets the phrase in favor of Mr. Algie.  *Yellow Book Sales and Distribution Co., Inc., v. JB McCoy Masonry, Inc.,* — N.E.3d —, 2015 WL 8479321, *4 (Ind. Ct. App., Dec. 10, 2015).  Therefore, the Court finds and concludes that, according to ¶ 5 of the *Contract*, Mr. Woodward's obligation and right "to commercially market all properties regarding the LP1 now in the custody of David Algie," arose only if unforeseen circumstances prevented Mr. Algie from completing a prototype aircraft that was ready for a flight-certification inspection to begin.

The parties dispute whether the LP1 prototype was ready for a flight-certification inspection to begin two years after the *Contract* was executed.  Mr. Algie alleges that it was ready for inspection before that time, in August, 2011, and that Mr. Woodward believed so as well and started looking for a DAR to conduct a certification inspection. *Counter Complaint*, ¶ 19;[11] *Response*, at 2.  Mr. Woodward argues that the prototype was not ready for a flight-certification inspection to begin at the two-year mark because Mr. McElroy, who commenced an inspection of the prototype in August, 2012, stopped his inspection after performing low-speed taxi testing because he found that problems with the the prototype rendered it unsafe and not airworthy to continue.  *Affidavit of Ron McElroy* [doc. 170-1].[12]

Mr. Woodward's implicit argument is that the fact that a prototype fails a flight-certification inspection means that the prototype was not ready for an inspection to begin. Such a construction would convert the "ready to begin" standard into a "passed inspection" standard and that is not how the Court has interpreted the "completing the

---

[11] The *Counter Complaint* is verified and its verification is substantially in the form prescribed by 28 U.S.C. § 1746.

[12] The Court notes, again, that it is considering Mr. McElroy's affidavit and report on the present motion because the Algies did not support their assertion at oral argument that Mr. Woodward did not disclose Mr. McElroy's evidence before the deadline for expert disclosures.  The Court's consideration of the evidence for present purposes does not mean that it will be admissible for later purposes, including trial, if the proper showing is made.

project" term of ¶ 5, as explained above.[13]   Whether a prototype of an experimental aircraft is ready for a flight-certification inspection cannot depend on whether it passes that inspection.  The parties did not address any other standard for determining when a prototype is ready for an inspection.  Therefore, the Court rejects Mr. Woodward's argument and concludes that he has not shown that Mr. Algie did not have a prototype completed to the point of flight certification within twenty-four months.

Although the above conclusions mean that Mr. Woodward is not entitled to judgment as a matter of law that he has the right to commercially market all properties regarding the LP1 now in the custody of David Algie and that the Algies have prevented him from exercising that right, the Court addresses the following alternative ground for denying him summary judgment.

The Algies argue that Mr. Woodward's right to market the LP1 properties under ¶ 5 is conditioned on whether "unforeseen circumstances" prevented Mr. Algie from completing the prototype and that no such unforeseen circumstances arose.  They contend that "unforeseen circumstances" means "extraordinary circumstances that the parties could not foresee at the time of contract execution."  *Algies Supp. Brief,* at 5.  As examples, they list weather disasters, unexpected lack of supplies, death (presumably of Mr. Algie), and war, but they argue that ordinary delays and problems that are associated

---

[13] Mr. Woodward did not argue a distinction between a prototype failing taxi testing and failing any later stage of an inspection, such as in-flight testing, possibly in support of an argument for a middle standard of inspection readiness, *e.g.*, a prototype that fails before the flight portion of an inspection was not ready for the inspection to begin.

with the development of a new aircraft that, by that time, Mr. Algie had worked on for twenty-two years, are not "unforeseen circumstances." *Id.*; *Oral Argument*. The Algies argue that Mr. Woodward has not shown the unforeseen circumstances that ¶ 5 requires to trigger his right to market the LP1 properties.

Mr. Woodward argues that "unforeseen circumstances" means just "circumstances." *Woodward Supp. Brief*, at 14. He also argues that the "unforeseen circumstances" clause should have the opposite effect than the literal language provides: "A harmonious interpretation of the clause that gives meaning to all terms of the Contract would be to interpret the clause as providing as follows: 'The parties to [*sic*] not foresee any reason that would prevent David Algie form [*sic*] completing the project within 24 months, however, if David fails to complete the project within that time, absent a [*sic*] unforeseen circumstances, then Loyd Woodward has the obligation and right to commercially market all properties regarding the LP1 now in custody of David Algie.'" *Id.* Mr. Woodward contends that this is how he believes unforeseen-circumstances clauses generally function in contracts, *i.e.*, as an excuse or defense protecting parties from liability for breach for non-performances that are caused by circumstances beyond their control, rather than as a condition creating rights.

The language of the *Contract* is plain: Mr. Woodward's right to commercially market all properties regarding the LP1 in the custody of Mr. Algie arises only if unforeseen circumstances prevented Mr. Algie from completing the LP1 within twenty-four months of the execution of the *Contract*. If Mr. Woodward wanted unforeseen

circumstances to *eliminate* rather than *create* his right to market the LP1 properties, then he did not draft the *Contract* that way and the Court may not rewrite it now. As written, the condition on Mr. Woodward's right is reasonable in the context of the invention of a new kit aircraft and the construction of a novel prototype for flight-certification inspection. In this context, "unforeseen circumstances" include the catastrophic and uncontrollable events identified by the Algies but does not include the delays and problems that are usually or commonly encountered when inventing a new product, because such commonly encountered delays and problems are foreseeable in this context. Because Mr. Woodward did not show that unforeseen circumstances prevented Mr. Algie from "completing the project" (even under Mr. Woodward's interpretation of "completing the project"), he is not entitled to judgment as a matter of law on this claim.

**Breach of Mr. Woodward's marketing rights.** Paragraph 4 of the *Contract* provides that Mr. Woodward "will receive from David Algie the right to exclusively market the LP1 and its technology." In his *Complaint*, Mr. Woodward claims that the Algies violated this provision by encouraging the customers to whom Mr. Woodward had pre-sold kits to cancel their orders with him and to re-place their orders with the Algies, *Complaint*, ¶ 69; actively attempting to sell the LP1 to out-of-state customers, *id.*, ¶ 70; and converting the LP1 for their own benefit and use by rebranding it the ACA3, *id.*, ¶ 71. In his *Motion*, Mr. Woodward claims that the Algies breached his marketing rights under the *Contract* by **(1)** engaging a new sales agent who has marketed and solicited sales for the rebranded LP1 and encouraged Mr. Woodward's pre-sale

customers to cancel their orders with him and to ask for their deposits to be returned; **(2)** marketing and soliciting the rebranded LP1 themselves; and **(3)** thereby, cutting out Mr. Woodward from the 20% commissions that the Algies agreed to pay him on each sale. *Motion*, at 6-8, 12.

The Algies respond that Mr. Woodward is not entitled to summary judgment on his claims because **(1)** the marketing, sales, and solicitations alleged by Mr. Woodward to be in breach of the *Contract* occurred long after his marketing rights expired under the *Contract*, and **(2)** they gave Mr. Woodward no right to a commission or royalty on sales. *Algies Supp. Brief*, at 4, 6.

Because the *Contract* does not contain a termination date for Mr. Woodward's exclusive and joint marketing rights, they were terminable at will by either party. "It is ordinary law that a contract containing no specific termination date is terminable at will and that where the parties fix no time for the performance or discharge of obligations created by the contract they are assumed to have had in mind a reasonable time." *City of East Chicago, Indiana v. East Chicago Second Century, Inc.*, 908 N.E.2d 611, 623 (Ind. 2009); *Grand Lodge Hall Ass'n, I. O. O. F. v. Moore*, 70 N.E.2d 19, 22, 224 Ind. 575, 584 (1945) ("a contract containing no specific termination date is terminable at will and . . . where the parties fix no time for the performance or discharge of obligations created by the contract they are assumed to have had in mind a reasonable time"), *aff'd*, 330 U.S. 808, 67 S.Ct. 1088, 91 L.Ed. 1265 (1947); *Rogier v. American Testing & Engineering Corp.*, 734 N.E.2d 606, 616 (Ind. Ct. App. 2000) ("A contract providing for continuing performance and which

25

has no termination date, or which provides that it will last indefinitely, is terminable at will by either party."); *Monon R. R. v. New York Central R. Co.*, 227 N.E.2d 450, 456-57, 141 Ind.App. 277 (App. Ct. 1967) (a contract with no specific termination date is terminable by the parties at will and is not perpetual).[14]

The question is whether and when Mr. Woodward's marketing rights were terminated. The Algies' alleged interferences with Mr. Woodward's marketing rights date from September through December, 2013. *Motion*, at 6-7; *Complaint*, ¶¶ 28-30, 32, 48. This is a year and more after Mr. Woodward gave Mr. Algie his *Termination Letter* that terminated his financial support of the project but reserved his marketing rights ("We will become only the sales force as originally agreed."). *Termination Letter* (Oct. 22, 2012). The Algies allege that, three days before this, Mr. Algie advised Mr. Woodward that "he would no longer accept any funding from him, *essentially terminating the association.*" *Counter Complaint*, ¶ 21 (emphasis added). He further alleges that, on that day, after a particularly hostile encounter with Mr. Woodward, he "had had enough of the verbal and emotional abuse, and unable to tolerate it any longer regardless of the consequences, was forced to *terminate ties* and Woodward's obsessive control over both Algie and the LP1 . . . ." *Id.* (emphasis added). See also *id.*, ¶ 27 ("Algie was forced to terminate the association with Woodward, given the unacceptable behavior, having already suffered

---

[14] For the duration of performance duties, s*ee Williams v. Indiana Rail Road Co.*, 33 N.E.3d 1043, 1060 (Ind. Ct. App. 2015), *trans. denied* ("'[a]n agreement in which the time of performance is not otherwise limited is presumed to continue for a reasonable time.'" quoting *Moseley v. Bishop*, 470 N.E.2d 773, 779 (Ind. Ct. App. 1984)); *Country Contractors, Inc. v. A Westside Storage of Indianapolis, Inc.*, 4 N.E.3d 677, 694 (Ind. Ct. App. 2014); *Demming v. Underwood*, 943 N.E.2d 878, 887 n. 6 (Ind. Ct. App. 2011) (unless a duration is specified, an agent's authority terminates after a reasonable period of time), *trans. denied.*

enough undue stress, mental and financial injury . . . .").  There is no dispute that Mr. Woodward fulfilled his obligation under the *Contract* to pay to Mr. Algie $84,000 of support during the year following execution of the *Contract*.  There is also no dispute that the substantial additional funds that Mr. Woodward paid directly to Mr. Algie and to support his development of the LP1 were not required under the *Contract* or any other agreement cited or suggested by the parties.  Therefore, the cessation in October 2012 of Mr. Woodward's additional financial support does not, alone, effect a termination of the *Contract*.  However, the parties did not address whether Mr. Algie's communication on October 19, 2012 effectively terminated the *Contract* or whether the parties' course of conduct, particularly Mr. Algie's alleged actions that were inconsistent with and allegedly violative of Mr. Woodward's exclusive marketing rights, confirm Mr. Algie's earlier termination of the *Contract* or independently terminated the *Contract*.  Therefore, the Court finds that a genuine dispute of material fact exists regarding if and when the *Contract* was terminated.  Therefore, it cannot conclude that Mr. Woodward is entitled to summary judgment as a matter of law that the Algies' conduct beginning in the fall of 2013 breached Mr. Woodward's marketing rights under the *Contract*.

The Court also concludes that a genuine dispute of material fact exists regarding whether the parties agreed that Mr. Woodward was entitled to a 20% commission on each sale of a kit airplane.  Mr. Woodward's sole evidence to support his allegation of an agreement on a commission is his one-sentence assertion contained his purported third affidavit, [doc. 149-40], Exhibit NN to his *Motion*, which was excluded as inadmissible

above.  Thus, there is no evidence of an agreement by the parties that Mr. Woodward was entitled to a commission for each sale of a kit airplane.[15]

The Court notes that, because the *Contract* does not provide for a sales commission, Mr. Woodward's entitlement must depend on an agreement outside the *Contract*, the evidence for which is not before the Court.  The Court also notes that Mr. Algie denies that there was any agreement for Mr. Woodward to receive a commission or royalty on sales or for any other means for Mr. Woodward to recoup his funding, beyond the discount price for an LP1 kit.  *Counter Complaint*, ¶¶ 12, 15, 28; *Algie Deposition*, p. 90, ll. 9-25.

Mr. Woodward has not shown that he is entitled to summary judgment on his claims that the Algies interfered with, prevented, or otherwise breached his marketing rights or his entitlement to a commission on sales.

**Mr. Woodward's right to purchase an LP1 kit.**   Mr. Woodward moves for summary judgment on his claim that the Algies have breach their contractual obligation

---

[15] Mr. Woodward did not argue that the lack of a provision for a sales commission or royalty in the *Contract* rendered the *Contract* invalid for lack of consideration.  Mr. Woodward received consideration in the form of a substantial discount on the purchase of an LP1 kit and any benefit to him of being the exclusive marketer of the LP1 kits and LP1 technology and the joint marketer of LP1 discoveries.  In addition, he received the satisfaction of supporting and encouraging the development, and hoped-for realization, of a new airplane kit design in which he believed, a satisfaction that he allegedly expressed to Mr. Algie.  See, *e.g.*, *Counter Complaint*, ¶¶ 14, 15.  As noted in the text, any right Mr. Woodward has to a sales commission must arise from an extra-*Contract* agreement — and that separate agreement must be supported by consideration.  Although Mr. Woodward argues that his interpretations of his rights under the *Contract* should be adopted because, otherwise, there is no way to protect or recoup the substantial additional funds that he expended on the LP1 project, his is not a legal or a persuasive argument.  Mr. Woodward is an experienced businessman and he drafted the *Contract*, *albeit* without legal counsel.  He had every opportunity to provide for recoupment of his payments or marketing costs.

to sell an LP1 kit to him for $40,000 by failing to produce a kit and intentionally refusing to produce a kit for him.  *Motion*, at 13.  This claim does not appear in Mr. Woodward's *Complaint*, either in the breach-of-contract count or the factual allegations.  Mr. Algie denies that he has refused to produce the LP1 in order to prevent selling a kit to Mr. Woodward.  Mr. Algie contends that the prototype had to be disassembled when he moved his shop and he has not proceeded further with the project due to the uncertainty caused by this suit.  The Court concludes that issues of material fact remain and that Mr. Woodward has not shown entitlement to summary judgment on this claim.

**2.  Mr. Woodward's count 2, breach of fiduciary duty.**  Count 2 of the *Complaint* claims that the Algies breached their fiduciary duties to Mr. Woodward by usurping the LP1 pre-sales made by him, engaging in the marketing and selling, and collecting deposits on the rebranded LP1, and other acts and omissions.  These claims depend on the Algies and Mr. Woodward being partners in the LP1 project, because that is the only basis for a fiduciary duty between them.  However, Mr. Woodward has failed to show that there is no genuine dispute about facts that are material to whether a partnership existed.

> A partnership is an association of two or more persons to carry on as co-owners of a business for profit.  Ind.Code § 23–4–1–6(1).  A "person" may be an individual, partnership, limited liability company, corporation, or other association. I.C. § 23–4–1–2.  The two requirements of a partnership are:  (1) a voluntary contract of association for the purpose of sharing profits and losses which may arise from the use of capital, labor, or skill in a common enterprise; and (2) an intention on the part of the parties to form a partnership. *Weinig v. Weinig*, 674 N.E.2d 991, 995 (Ind.Ct.App.1996).

*Life v. F. C. Tucker Co.*, 948 N.E.2d 346, 351-52 (Ind. Ct. App. 2011).

The *Complaint* and Mr. Woodward's *Motion* rely on two pieces of evidence to prove that the parties agreed to form a partnership. The first is Mr. Algie's statement in his declaration that "I was approached by Plaintiff Loyd Woodward with a proposition to devote my full-time efforts at constructing a light airplane kit prototype in partnership with Woodward . . . ." *Algie Declaration*, ¶ 2, cited in *Complaint*, ¶ 10, and *Motion*, at 3. This statement is evidence only that Mr. Woodward *approached* Mr. Algie to form a partnership; there is no support here for the assertion that the Algies agreed or intended to enter into a partnership with Mr. Woodward.

The second piece of evidence are several pages of Mr. Algie's deposition transcript wherein Mr. Woodward's counsel questions Mr. Algie about the use of the word "partnership" in a trade-publication article about the LP1 and whether he was in partnership with Mr. Woodward. *Algie Deposition*, at p. 270, l. 16, through p. 276, l. 22, cited in *Motion*, at 3. Counsel asked about a news item (or advertisement) in the June 2010 issue of *Sport Aviation* that reads: "Algie Composite Aircraft, partnering with Woodward Aerospace, introduced the LP1." *Id.*, p. 270, l. 16 through p. 272, l. 6. Mr. Algie answered that he had no involvement with writing the item and did not provide information for it and that he thought that Mr. Woodward or his son might have been responsible for the item.

When asked by counsel if Mr. Woodward was a partner with him in the LP1 project, Mr. Algie answered that "[h]e was a partner of sorts but not on the contract. He

30

did not own part of the company.  How do you define a partnership?  We were working together."  *Id.*, p. 272, ll. 18-23.   Pressed further on whether the use of the word "partnership" in the ad and in the above-quoted sentence from the *Algie Declaration* was accurate, Mr. Algie answered:

> A.   Well, the terminology of partnering, to me, is a different thing. Whether I've used or misused that word, but I was working in partnership with him, yes.
>
> Q.   Okay.  So –
>
> A.   You can define partnership however you want.  It's my –
>
> Q.   Well, there's the legal definition of it, so.
>
> A.   Legal definition is probably that he have ownership of the company, where he did not.
>
> *      *      *
>
> Q.   And you guys were going to share the profits in some way?
>
> A.   No.

*Id.*, p. 271, l. 25, through p. 275, l. 24.   Mr. Woodward's counsel then asked Mr. Algie whether his statement that he offered to Mr. Woodward to do something for him (in light of his substantial extra payments to support the LP1 project) and Mr. Woodward responded that he would take $5,000 per airplane sold as a commission shows that they were intending to share the profits, and Mr. Algie answered that it did.  *Id.*, p. 276, l. 1-22.

Mr. Algie's answers can reasonably show that he did not intend to form a partnership with Mr. Woodward and that he did not believe that he had.  He indicated that Mr. Woodward did have any ownership in the LP1 and he denied being involved in

the trade ad that described their association as a partnership.  His responses can reasonably support the inference that he used the word "partnership" in a lay sense, not in its technical, legal sense, and that he denied that the elements of a partnership existed. (Mr. Algie was not represented by counsel at the deposition.)  In addition, the Court notes that a commission paid to Mr. Woodward in the amount of $5,000 per plane or 20% of the sales price of each plane would not constitute sharing in the profits and losses of a partnership because they are paid regardless of the financial performance of the partnership.

For their part, in their verified *Counter Complaint*, the Algies allege that no partnership was formed with Mr. Woodward; in fact, they allege that they affirmatively rejected his proposal to form one.  *Counter Complaint,* ¶¶ 7 ("Algie refused any requests for a partnership, from Woodward as well as numerous other such offers in the past."), 8 ("When a partnership was suggested by Woodward, Algie adamantly declined."), 16 ("Woodward was an investor, nothing more.  Not a partner or otherwise co-owner, as Woodward repeatedly declares nor was there any intent on Algies' part to grant or confer a partnerhsip.").

The evidence on the present motion shows a genuine dispute of fact that is material to Mr. Woodward's claim that the Algies breached their fiduciary duties to him: namely, whether the parties formed a partnership.

**3.  Mr. Woodward's count 3, tortious interference.**  The elements of an action for tortious interference are:  **(1)** existence of a valid and enforceable contract between the

32

plaintiff and a third party **(2)** knowledge of that contract by the defendant, **(3)** intentional inducement of a breach of that contract, **(4)** absence of justification, and **(5)** damages. *Bilimoria Computer Systems, LLC v. America Online, Inc.*, 829 N.E.2d 150, 156 (Ind. Ct. App. 2005). The *Complaint* alleges that the Algies tortiously interfered with his contracts by marketing and selling the rebranded LP1 over the LP1, interfering with the sixteen LP1 pre-sales that Mr. Woodward obtained, and "other actions described [in the *Complaint*]." *Complaint*, ¶ 86.

Both the *Complaint* and the *Motion* identify two instances of tortious interference by the Algies. The first is a statement by Mr. Algie on an online discussion forum about Algie Composite Aircraft: "I [David Algie] do not maintain, supply, or recommend going to the Woodward Aerospace Facebook page. For current technical info please refer back here or email me directly. Home page can be found at [web address]." *Motion*, Exhibit Z [doc. 149-26] and p. 6; *Complaint*, ¶ 28. A similar statement appears on the Algie Composite Aircraft webpage. *Motion*, Exhibit Y [doc. 149-25] and p. 6; *Complaint*, ¶ 28. The second asserted instance of tortious interference is a statement in a post on the Algie Composite Aircraft webpage: "For certain the LP1 will never fly nor will anyone ever get a kit if he is successful," *Motion*, Exhibit Y [doc. 149-25] and p. 6; *Complaint*, ¶ 28, which Mr. Woodward contends implies that he lacked the ability to complete the LP1 project, *Motion*, at 6. The statement is within an update post that describes the present suit as Mr. Woodward's attempt to obtain the entire LP1 program ("prototype aircraft, tooling and all") and that mentions his litigation defense fund. *Motion*, Exhibit Y. In his *Motion*, Mr.

Woodward asserts a third instance of interference:  that the Algies interfered with Mr. Woodward's sixteen pre-sale contracts by intentionally and purposefully refusing to complete the LP1, which prevented him from satisfying the contracts.  Mr. Woodward claims that the Algies' interference damaged him in the amount of lost commissions and lost partnership profits.  *Motion,* at 15.

The date that Mr. Algie posted the identified statements to the discussion forum and his webpage are not given.  The only fact alleged is that the discussion-forum statement appeared as of October 6 or 7, 2013.  *Complaint,* ¶ 28; *Motion,* at 6.  That is almost a year after Mr. Algie alleges that he terminated his relationship, and the *Contract,* with Mr. Woodward.   The statements that Mr. Algie does not maintain or supply the Woodward website and that he does not recommend going there for current technical information, instead referring readers to his own webpage, are not necessarily directed to the sixteen past pre-sale customers of Mr. Woodward and can fairly be interpreted as statements of where readers, including past and potential future customers, may obtain current technical information.  Mr. Woodard does not allege or argue that the statements are inaccurate or "unjustified" when made after the termination of the *Contract* and the Algies' relationship with Mr. Woodward.  Similarly, Mr. Algie's statement that, if Mr. Woodward succeeds in his suit and takes over the LP1 project, then the LP1 will not fly and no one will receive an LP1, reasonably can be interpreted as an assertion that Mr.

34

Algie's knowledge and skills are essential to completing the LP1 as originally intended,[16] and it would be a fact question whether such a statement is substantially accurate and was an unjustified and intentional interference with Mr. Woodward's sixteen pre-sale contracts.

In addition, no evidence has been cited indicating when, in relation to when these statements appeared online, Mr. Woodward's sixteen pre-sale customers cancelled their orders and asked for the return of their deposits.  In addition, no evidence has been cited showing that the online statements, or any other actions by the Algies, induced Mr. Woodward's pre-sale customers to "breach" their agreements with Mr. Woodward.  To prevail on his tortious-interference claim, Mr. Woodard must prove that the Algies unjustifiably induced his customers to "breach" their contracts, and the Algies allege, and evidence shows, that the pre-sale contracts were terminable by the customers at will at the time.  *Motion*, Exhibit V [doc. 149-22], at p. 2.  Thus, fact questions remain whether the customers saw the webpage statements, whether they were induced thereby to cancel their orders, and whether the statements were false or unjustified.  In addition, the Court finds that the briefing on the legal question whether the cancellation of a terminable-at-will agreement can constitute a breach that is actionable as a tortious interference was insufficient.

---

[16] Mr. Woodward's sixteen customers and potential future customers might place their orders for the LP1 because of their confidence in or reliance on Mr. Algie's vision and skills.

Finally, Mr. Woodward's allegations that the Algies interfered with potential contracts that he might have with future customers by usurping or interfering with his exclusive marketing rights might state a claim for breach of an agreement between Mr. Woodward and the Algies, but they do not state a claim for tortious interference because of the absence of existing contracts which could be interfered with.

Genuine disputes of material fact remain and Mr. Woodward has not shown that he is entitled to a judgment as a matter of law on his tortious-inference claims.

**4. The Algies' claim for promissory estoppel.**  The elements of an action for promissory estoppel are: "(1) a promise by the promisor; (2) made with the expectation that the promissee will rely thereon; (3) which induces reasonable reiance by the promissee; (4) of a definite and substantial nature; and (5) injustice can be avoided only by enforcement of the promise." *Indiana Bureau of Motor Vehicles v. Ash, Inc.*, 895 N.E.2d 359, 367 (Ind. Ct. App. 2008).[17]

In their *Counter Complaint*, The Algies based their claim for promissory estoppel on only their allegations that Mr. Woodward promised to fly the LP1 prototype to air

---

[17] Mr. Woodward briefed the elements of a defense of equitable estoppel, *Reeve v. Georgia-Pacific Corp.*, 510 N.E.2d 1378, 1382 (Ind. Ct. App. 1987), which requires proof of "a fraudulent representation or such negligence as will amount to fraud in law" or constructive fraud. *Id.* "[T]here need not be any design to defraud in order to constitute an estoppel. It is sufficient if the conduct of the party has been knowingly such as would make it unconscionable on his part to deny what his conduct had induced another to believe and act upon in good faith and without knowledge of the facts." *Id.* "The elements which comprise the equitable estoppel defense are essentially those which would give rise to a claim for actual or constructive fraud." *Id.* A promissory-estoppel defense or claim is a different action.

shows in order to market it and that they relied solely on this promise to enter into the *Contract. Counter Complaint*, ¶¶ 8, 34, 36. They further alleged that Mr. Woodward later stated that he would never fly the LP1 to air shows or anywhere else, *id.*, ¶ 34, and that his October 22, 2012 *Termination Letter* was a repudiation of his promise, *Algies Supp. Brief*, at 15.[18] In their *Response* to the present motion, the Algies expanded their claim: now the claim is based on "Woodward's total concealment of his true intentions with his agreement: not to work solely as the LP1 sales agent but to take the entire LP1 program in its entirety" and turn Mr. Algie into Mr. Woodward's employee. *Response*, at 8-9. In their post-hearing brief, the Algies return to their *Counter Complaint* reliance on only Mr. Woodward's promise "to fly the LP1 in order to induce the contractual relationship and then repudiated that promise." *Algies' Supp. Brief*, at 15. The Court construes the Algies' claim to be based solely on Mr. Woodward's repudiation of his promise to fly the LP1 prototype for air shows and for test flights.

The Algies point out that, in Indiana law, "when an express contract does not fully address a subject, a court of equity may impose a remedy to further the ends of justice." *Coppolillo v. Cort*, 947 N.E.2d 994, 998 (Ind. Ct. App. 2011). This is an exception to the rule that implied-in-law theories are not available in the presence of an express contract. The Algies contend that, because the *Contract* does not address Mr. Woodward's promise

---

[18] It is unclear whether the Algies allege one or two acts of repudiation — either both a verbal repudiation and the *Termination Letter* or only the *Termination Letter*. In their *Response*, they appear to indicate that Mr. Algie's and Mr. Woodward's conversation on October 22, 2012, included a verbal repudiation of Mr. Woodward's promise to fly the LP1 as well as a tender of the *Termination Letter*, *Response*, at 9, ¶ 1, but this is far from certain.

to fly the prototype, promissory estoppel can provide a remedy for his repudiation of his promise.  The Court agrees.

There are some issues regarding the Algies' claim.  First, Mr. Woodward's *Termination Letter* was tendered three days after Mr. Algie contends that he terminated his relationship with Mr. Woodward and the *Contract, Counter Complaint*, ¶¶ 21, 27, and over a year after Mr. Woodward's monthly payments under the *Contract* were completed, the point that the Algies argued was a reasonable termination point for the *Contract. Algies Supp. Brief*, at 7.  It does not appear that a claim for a promissory-estoppel remedy is viable if Mr. Woodward's alleged repudiation of his promise to fly the LP1 prototype occurred after the *Contract* was terminated because his promise would be moot.

Second, there does not appear to be any evidence that the LP1 prototype has been at a point where it could be flown to air shows or for "test flights."  The Algies have not alleged any pre-termination "test flights" that they wanted Mr. Woodward to make or any air shows to which they wanted Mr. Woodward to fly the prototype, but Mr. Woodward refused.  Thus, there is a question whether there is evidence of any injury or damage that Mr. Woodward's alleged repudiation of his promise to fly the prototype caused the Algies.

Therefore, fact questions questions remain regarding whether **(1)** Mr. Woodward made a promise to fly the prototype; **(2)** if so, when he repudiated his promise; and **(3)** whether and when the *Contract* (and Mr. Woodward's promise) was terminated.  In addition, legal issues remain regarding the viability of the Algies' promissory-estoppel

claim if Mr. Woodward repudiated his promise after the *Contract*, and Mr. Woodward's promise, were terminated; whether the Algies can assert a claim for promissory estoppel when no opportunity for Mr. Woodward to fly the prototype had arisen; and whether the Algies promissory-estoppel claim allows a recovery for only the damages caused by Mr. Woodward's repudiation of his promise or can encompass damages caused by Mr. Woodward's promise inducing the Algies to enter the *Contract*.

### Algies' request for summary judgment

At oral argument and in their supplemental brief, the Algies moved for summary judgment in their favor on Mr. Woodward's claims and in favor of Ms. Algie.  Because they did not file their own motion for summary judgment, the request is denied.  Whether rulings herein render any of Mr. Woodward's claims unviable will be addressed in a status conference.

### Conclusion

*Plaintiff's Motion for Leave To Supplement Exhibit "NN" to Motion for Summary Judgment* [doc. 197] is **DENIED**.  *Plaintiff's Motion for Summary Judgment* [doc. 149] is **DENIED**.  The Algies' request for summary judgment in their favor on Mr. Woodward's claims is **DENIED**.

**DONE this date:**  03/29/2016

*Denise K. LaRue*

Denise K. LaRue
United States Magistrate Judge
Southern District of Indiana

Distribution to all ECF-registered counsel of record *via* ECF-generated e-mail.