# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA,
### INDIANAPOLIS DIVISION

| | |
|---|---|
| **LOYD WOODWARD,** | |
| **Plaintiff,** | |
| *vs.* | **CAUSE NO.  1:13-cv-1435-DKL-RLY** |
| **DAVID ALGIE and LINDA ALGIE,** | |
| **Defendants.** | |

## FINDINGS OF FACT and CONCLUSIONS OF LAW

This Cause came before the Court for a bench trial on Monday, August 29, 2016.

Appearing were plaintiff Harold Loyd Woodward, proceeding *pro se*; defendants David

Algie and Linda Algie; and Matthew B. Barr and Alexander Pape Orlowski, attorneys

representing Defendants.  Plaintiff and Defendants testified and evidentiary exhibits

were admitted.  At the trial, Dr. Woodward dismissed all of his claims against Linda

Algie, and Linda Algie dismissed her counterclaim for promissory estoppel.  Therefore,

the Court dismissed Linda Algie from this Cause.


The following claims were tried:

**Dr. Woodward's claim for breach of contract.**  Mr. Woodward proceeded to trial

on the following alleged breaches of contract by David Algie:  **(a)** Mr. Algie's failure to

complete the LP1 prototype airplane to the point of flight certification by the contract

deadline; **(b)** Mr. Algie's interference with Dr. Woodward's exclusive rights to market

and sell LP1 kits; **(c)** Mr. Algie's refusal to pay sales commissions to Dr. Woodward; and

**(d)** Mr. Algies' refusal to surrender LP1 properties to be commercially marketed by Dr.

1

Woodward.  *Pretrial Order* [doc. 243], § A.1.; *Verified Amended Complaint for Damages and Injunctive and other Equitable Relief* [doc. 118] ("*Amended Complaint*"), Count 1, ¶¶ 66-73.

**Dr. Woodward's claim for deception and conversion.**  Dr. Woodward alleges that, through deceptive practices, misrepresentations, improper conduct, bad faith, fraudulent conveyances, and misappropriation of funds, Mr. Algie conveyed, encumbered, took, and misappropriated assets and funds belonging to his and Dr. Woodward's partnership, to the detriment of the partnership and Dr. Woodward.  Dr. Woodward asserts that these acts constitute deception and conversion under Indiana Code § 35-43-4-3, in that Mr. Algie knowingly or intentionally exerted unauthorized control over the partnership assets.  *Pretrial Order*, § A.2.; *Amended Complaint* [doc. 118], Count 4, ¶¶ 92-99.

**Mr. Algie's counterclaim for promissory estoppel.**  Mr. Algie alleges that Dr. Woodward's promise to fly the LP1 prototype to airshows for marketing purposes and to fly it for the number of miles required by the Federal Aviation Administration for final flight certification ("mile logging"), without compensation and paying for all costs and expenses thereof, was the dispositive inducement for Mr. Algie to execute the contract, leave his lucrative career in the Indy-car field, and devote his full-time efforts to finalizing the LP1 prototype.  Mr. Algie alleges that Dr. Woodward's repudiation of his promise in October 2012 injured him by causing him to lose his Indy-car salary since early 2010 and by rendering it unlikely that he can return to that field of work.  *Pretrial Order*, § A.3.; *Counter Complaint . . . and Temporary Injunction* [doc. 122] ("*Counter Complaint*"), First Cause of Action, ¶¶ 31-36.

**Findings of Facts**

**1.**  Defendant David Algie was born in New Zealand in 1963.  After graduating from high school at the age of fifteen, he started training as an apprentice panel beater.[1] About two and one-half years later, he moved to the United States and began working successively for various IndyCar racing teams as a fabricator, mechanic, and body man, until the end of 2009.  He has no formal education or degrees beyond high school and developed his knowledge and skills through private study and on-the-job training.  Much of his career involved designing and constructing parts and car-body components from composites including carbon fiber and epoxy resin compounds.[2]  He also obtained experience working with engines and other components of IndyCar racing cars.

**2.**  Some time before 1993, Mr. Algie began thinking about applying his expertise with composites and his knowledge of engines and other racing-car technologies to the development of a kit airplane.  He believed that he could design and produce a kit aircraft that would be better than kits currently on the market.  The chief advantages he foresaw were lighter weight and easier assembly, permitting a kit buyer to assemble the aircraft himself, without hiring a skilled kit engineer.  Mr. Algie started in 1993 with studying,

---

[1] A term used in some Commonwealth countries to refer to a person who repairs damage to vehicles' bodywork, comparable to an "auto body mechanic" in the United States.  *Macmillan Dictionary*, "panel beater," www.macmillandictionary.com/us/dictionary/british/ panel-beater; Wikipedia, "panel beater," https://en.wikipedia.org/wiki/Panel_beater.

[2] Mr. Algie described the composite he worked with as carbon fiber with an epoxy resin inside.  He utilized a honeycomb core for the structure of a body part, then cured the epoxy with heat under pressure in order to form a rigid, tough part.

3

designing, and drawing, and he started cutting parts for the prototype in 1995.  He named the airplane the "LP1," for "light plane one."

3.   Plaintiff Harold Loyd Woodward is a resident of Texas.  He testified to the following biographical facts.  He is a physician certified in emergency-room medicine (currently practicing as a part-time emergency-room doctor).  He has an M.B.A. from Ohio State University.  He is part owner of Woodward Aerospace, a limited-liability corporation that he formed with his son, which is involved in selling kit aircraft in the United States and the world.  He received his pilot's license in 1977 and has been an aviation enthusiast for forty years.   He has accumulated over 10,000 hours of flight time and has received ratings in single-engine, mutli-engine, complex-aircraft instrument, and other ratings.  He built his first kit aircraft in 1978 and has participated in over six builds of kit aircraft.  He has designed over six concept aircraft.  He has over two hundred flight hours in an aircraft with the same engine that is in the LP1.

4.   Dr. Woodward first became aware of the LP1 and Mr. Algie in 2008, through the internet, and he initiated contact with Mr. Algie by e-mail that year.  There followed further communications and an invitation by Mr. Algie for Dr. Woodward to visit Indianapolis to see the LP1.  Dr. Woodward visited Mr. Algie and his shop in Indianapolis twice in 2009.

5.   Dr. Woodward and Mr. Algie discussions turned to proposals for Dr. Woodward to provide financial support to Mr. Algie to further his work on the LP1.  Dr. Woodward drafted and sent to Mr. Algie a proposed agreement ("*Contract Agreement*").

4

Mr. Algie, his wife, Linda Algie, and Dr. Woodard signed the agreement, which bears the

date December 30, 2009.  The *Contract Agreement* reads as follows:

### Contract Agreement

The purpose of the contract is to facilitate the completion of the David Algie's Light Plane 1 hence named the LP1.  This will simply be referred to as the Agreement.

Parties to this contract are David Algie, Linda Algie, and Loyd Woodward a single man.

David Algie will receive from Loyd Woodward the sum of $7000.00 per month for one year.  This will be used for support of David Algie so that he can devote his efforts to complete the LP1 to the point of flight certification.

Loyd Woodward will receive from David Algie the right to exclusively market the LP1 and its technology.  It is understood that David Algie may have sold up to 5 kits already and these will not be subject to this agreement.  For an additional sum of $40,000.00 Loyd Woodward will have purchasing rights of an LP1 for his individual use.

Loyd Woodward will also receive the rights to commercially market all improvements, inventions, and/or discoveries made during the development of the LP1, whether patentable, copyrightable or not.  Loyd Woodward reserves the right to assign these rights to a business entity.  These rights shall be joint property of David Algie and Loyd Woodward.  Should unforeseen circumstances prevent David Algie from completing the project within 24 months then Loyd Woodward has the obligation and right to commercially market all properties regarding the LP1 now in custody of David Algie.

Executed this  30th  Day of December 2009

[signatures of Dr. Woodward, Mr. Algie, and Mrs. Algie]

Defendant's Exhibit A.

**6.**   Dr. Woodward and Mr. Algie agree that the *Contract Agreement* is a valid

contract.

7.   Before he had encountered Dr. Woodward, Mr. Algie, who is not a pilot and does not have a pilot's license, had secured a test pilot, Steve Flattum, who had agreed to serve as test pilot for the LP1 prototype free-of-charge.  (A test pilot performs flight tests of a newly designed aircraft to evaluate the design.)  Mr. Flattum declined to pilot the "mile-logging," or "fly off," flights free-of-charge.  Mile-logging refers to the forty hours of restricted-area flying that the Federal Aviation Administration requires before finally certifying an aircraft as safe.  Mr. Flattum also required payment to fly the prototype to air shows and other events that would be most advantageous for marketing the LP1.  Mr. Algie testified that Mr. Flattum was willing to serve as test pilot without payment because it is a matter of honor and prestige among test pilots to be the first to fly new experimental aircraft during their development.  Mr. Flattum was not interested in flying the ordinary mile-logging and air-show flights without compensation.

8.   Mr. Algie estimated that it would cost $15,000 to complete the required mile-logging hours.  He estimated that it would cost $35,000 to promote the LP1 at air shows for one year, including payments for space rental (thousands of dollars), fuel to fly the prototype there and back, pilot's time (Mr. Flattum wanted $500 per day), and pilot's accommodations (*e.g.*, lodging, meals).

9.   Before the *Contract Agreement* was signed, Mr. Algie expressed to Dr. Woodward his desire to find a pilot who would fly the prototype free-of-charge for mile-logging and air-show marketing and who also would cover the expenses of doing so.

**10.**  Before the *Contract Agreement* was signed, Dr. Woodward expressed to Mr. Algie his enthusiasm to fly the LP1 prototype in general and to fly it to air shows and promote the LP1 kits.

**11.**  Dr. Woodward and Mr. Algie did not agree, either before or after the *Contract Agreement* was executed, to give Dr. Woodward a sales commission of "no more than twenty percent" of the sales price of each LP1 kit that he sold through exercising his marketing rights under the *Contract Agreement*.

**12.**  Dr. Woodward and Mr. Algie did not enter into a currently enforceable agreement giving Dr. Woodward the right to a sales commission of $5,000 for each LP1 kit that he sold through exercising his marketing rights under the *Contract Agreement*. After the *Contract Agreement* was executed, Mr. Algie asked Dr. Woodward about the *Contract Agreement* not giving him much direct financial benefit.   Dr. Woodward responded that he would take $5,000 per kit sold.  Mr. Algie agreed.  This agreement was not reduced to writing.  When Mr. Algie later asked Dr. Woodward further about the commission, Dr. Woodward responded that he did not need that money, he just wanted to see the LP1 fly.  This abnegated their oral agreement for a $5,000 per-kit commission. Both Dr. Woodward and Mr. Algie treated the earlier agreement as null and void.  Dr. Woodward has not made a claim for a $5,000-per-kit commission.

**13.**  Mr. Algie did not agree to enter into a legal partnership with Dr. Woodward.

14.   After the *Contract Agreement* was signed, Mr. Algie quit his last IndyCar job, a sixteen-year position with Andretti Autosport, that last paid $67,000 annually.

15.   Dr. Woodward paid $7,000 each month to Mr. Algie for the one-year period specified in the *Contract Agreement*.  Dr. Woodward continued to pay $7,000 each month to Mr. Algie after expiration of the year period, until October 2012.  Dr. Woodward also paid additional amounts to support the LP1 project, including payments for expenses and supplies, until October 2012.

16.   From December 2009 to October 2012, Mr. Algie worked full-time to complete the LP1 prototype so that it could be flight certified and so that production of kits could commence.  During this time period, there was no indication that Mr. Algie lacked the skill, expertise, or intention to complete the LP1 prototype and have it flight certified.

17.   From December 2009 to October 2012, there were no natural disasters, catastrophic events, interruptions of supplies, incapacitations of Mr. Algie, destruction of the prototype or the shop, or other Acts of God that prevented completion of the LP1 prototype or the commencement of flight certification.

18.   After the *Contract Agreement* was executed, and pursuant to Dr. Woodward's marketing efforts thereunder, sixteen customers paid deposits for "pre-sales" of LP1 kits and to secure their priority positions in the line for delivery.  All of the pre-sale agreements allowed the customers to cancel their contracts at will, without penalty, and with a full refund.

19.     By August 2011, Dr. Woodward began searching for a Designated Airworthiness Representative ("D.A.R.") to conduct the initial stages of flight certification of the LP1 prototype.  In the winter of 2011, Dr. Woodward secured a D.A.R. and told him that the LP1 prototype was ready to begin flight certification.  Flight certification did not begin at that time.  In or before August 2012, the LP1 prototype taxied around an airport taxiway.

20.     On and after December 30, 2011, twenty-four months after execution of the *Contract Agreement*, Dr. Woodward did not assert, invoke, or act on his "obligation and right to commercially market all properties regarding the LP1 now in custody of David Algie" under the *Contract Agreement*, ¶ 5.  Dr. Woodward testified that he refrained from exercising his asserted rights under the *Contract Agreement* for three reasons:  **(1)** patience and leniency with Mr. Algie; **(2)** the LP1 already had pre-sale customers at that time; and **(3)** he did not want the project because he wanted Mr. Algie to have the project and it was more convenient for Mr. Algie to supply the kits than for Dr. Woodward to manufacture them himself.  Dr. Woodward agreed to give Mr. Algie more time to get the LP1 prototype to the point of flight certification.  There was never an agreement on, or a declaration by Dr. Woodward of, a new deadline.  Every month or so after December 2011, Mr. Algie told Dr. Woodward that he needed more time and Dr. Woodward agreed to more time.  Dr. Woodward never denied Mr. Algie's requests for more time.

21.     Beginning in July 2012, after Mr. Algie moved the LP1 prototype to the airport, the business and personal relationship between Dr. Woodward and Mr. Algie began to

deteriorate as Mr. Algie observed Dr. Woodward becoming increasingly "sour" on the project and becoming more unpleasant, uncooperative, and aggressive.

22.  On Friday, October 19, 2012, Dr. Woodward and Mr. Algie had a meeting.  It lasted a few hours and became heated.  At one point, Mr. Algie feared that Dr. Woodward was about to strike him.  Mr. Algie told Dr. Woodward that Dr. Woodward clearly was not happy, there was something wrong with their relationship, and Mr. Algie did not know what it was.  Mr. Algie repeatedly told Dr. Woodward to stop paying money and Mr. Algie would get the aircraft to him.  Dr. Woodward responded that he would not fly the airplane.  Mr. Algie's impression at the time was that his and Dr. Woodward's business relationship was terminated.

The next day, Saturday, October 20, 2012, Dr. Woodward called Mr. Algie and said that he wanted to talk to him about forming a partnership.  Mr. Algie refused to discuss or enter into a partnerhip.  There was no further contact that day and none on Sunday, October 21, 2012.

On Monday, October 22, 2012, Dr. Woodward met Mr. Algie at work and asked again about Mr. Algie's willingness to enter into a partnership with Dr. Woodward. When Mr. Algie again refused, Dr. Woodward handed him a pre-written letter, dated October 22, 2012, stating that it it was "official notice" that Dr. Woodward had exceeded their contract, that there would be no future funding, that no further funding was contractually required, that he would "become only the sales force as originally agreed," and that he would honor current pre-sale contracts."  Plaintiff Exhibit M7.

23. On October 26, 2012, Mr. Algie posted on his LP1 internet group site a notice that "Woodward Aerospace has decided to part company with me as of this week." Defendant's Exhibit E. Dr. Woodward was a member of this internet group and was aware of this posting.

24. The next day, October 27, 2012, Dr. Woodward sent an e-mail to Mr. Algie stating that "Woodward Aerospace still retains the sales contracts for all LP1. At your request and actions we no longer have any thing to do with development. Please make this correction in thought and correspondence." Defendant's Exhibit Q. The e-mail also referred to Mr. Algie's October 26, 2012, group post. Mr. Algie understood the first sentence of this e-mail to mean that Dr. Woodward still possessed the pre-sale deposits. Mr. Algie believed that, at this time, Dr. Woodward did not have any rights under the *Contract Agreement*, the contract was terminated, and their business relationship had ended.

25. Eventually, all of the pre-sale customers exercised their rights to cancel their pre-sale contracts and Dr. Woodward refunded all of their deposits.

26. Mr. Algie did not encourage any pre-sale customer to cancel his contract. Between December 2009 and October 2012, Mr. Algie did not market, sell, or pre-sell, or attempt to market, sell, or pre-sell, any LP1 kits. Between December 2009 and October 2012, Mr. Algie did not make any improvements, inventions, and/or discoveries during the development of the LP1.

27.   To this date, Mr. Algie has not completed the LP1 prototype, had it flight certified, or commenced the production of kits.  After October 2012, Mr. Algie has not worked with Dr. Woodward, accepted any funds from him, or given to him or recognized that he possesses any marketing or sales rights in the LP1.

**Conclusions of Law**

28.   On the parties' declarations at the trial, Linda Algie is dismissed from this Cause as a defendant on Dr. Woodward's claims and as a plaintiff on the counterclaim, and all claims against and by her in this Cause are dismissed.

29.   In Indiana, a breach-of-contract claim has the following elements:  **(1)** the existence of a contract, **(2)** defendant's breach thereof, and **(3)** damages.  *Roche Diagnostics Operations, Inc. v. Marsh Supermarkets, LLC*, 987 N.E.2d 72, 85 (Ind. Ct. App. 2013), *trans. denied*.  Dr. Woodward has the burden of proving each element.  *Kishpaugh v. Odegard*, 17 N.E.3d 363, 374-75 (Ind. Ct. App. 2014).

30.   "The goal of contract interpretation is to determine the intent of the parties when the agreement was made."  *Yellow Book Sales and Distribution Co., Inc. v. JB McCoy Masonry, Inc.*, 47 N.E.3d 388, 392 (Ind. Ct. App. 2015).  "'If a contract's terms are clear and unambiguous, courts must give those terms their clear and ordinary meaning.'"  *Id.*, at 393.  "'An ambiguous contract will be construed against the party who drafted it.'"  *Id.* "'A contract is ambiguous if a reasonable person would find the contract subject to more than one interpretation.'"  *Id.*

**31.**   "It is ordinary law that a contract containing no specific termination date is terminable at will and that where the parties fix no time for the performance or discharge of obligations created by the contract they are assumed to have had in mind a reasonable time." *City of East Chicago, Indiana v. East Chicago Second Century, Inc.*, 908 N.E.2d 611, 623 (Ind. 2009); *Grand Lodge Hall Ass'n, I.O.O.F. v. Moore*, 70 N.E.2d 19, 22, 224 Ind. 575 (Ind. 1945), *jmt. affirmed*, 330 U.S. 808 (1947); *Rogier v. American Testing and Engineering Corp.*, 734 N.E.2d 606, 616 (Ind. Ct. App. 2000); *Monon Railroad v. New York Central Railroad Co.*, 227 N.E.2d 450, 456-57, 141 Ind.App. 277 (Ind. Ct. App. 1967).

**32.**   Both Dr. Woodward and Mr. Algie allege and assert that the *Contract Agreement* is a valid, enforceable contract.   The *Contract Agreement* was a valid, enforceable contract under Indiana law.

**33.**   Any ambiguous terms in the *Contract Agreement* are construed against Dr. Woodward as the drafter thereof.

**Dr. Woodward's breach-of-contract claims:**

Dr. Woodward claims that Mr. Algie committed the following breaches of the *Contract Agreement*:

**34.   Mr. Algie failed to complete the LP1 prototype to the point of flight certification by the contract deadline.**

**a.**   The *Contract Agreement* does not require Mr. Algie to complete the LP1 prototype to the point of flight certification by a deadline.   Dr. Woodward did not prove

13

by a preponderance of the evidence that Mr. Algie made such an enforceable, contractual promise outside the *Contract Agreement*.

**b.** At most, the *Contract Agreement* provides that Dr. Woodward has a certain "obligation and right" if unforeseen circumstances prevent Mr. Algie from completing the LP1 project within twenty-four months.

**c.** Dr. Woodward did not prove, by a preponderance of the evidence, that Mr. Algie breached the *Contract Agreement* by failing to complete the LP1 prototype to the point of flight certification by the contract deadline.

**35. Mr. Algie interfered with Dr. Woodward's exclusive rights to market and sell LP1 kits.**

**a.** As found by the Court above, Mr. Algie did not encourage the pre-sale customers to cancel their contracts and demand that Dr. Woodward refund their deposits. Between December 2009 and October 2012, Mr. Algie did not market, sell, or pre-sell, or attempt to market, sell, or pre-sell, any LP1 kits. Between December 2009 and October 2012, Mr. Algie did not make any improvements, inventions, and/or discoveries during the development of the LP1.

**b.** Because Dr. Woodward's right to exclusively market the LP1 and its technology under the *Contract Agreement* does not contain a specific termination date, it was terminable at will by either party.

**c.** Mr. Algie terminated Dr. Woodward's marketing rights under the *Contract Agreement* by his statements and actions on October 19, 2012, and/or October 26, 2012.

14

**d.**  Dr. Woodward did not prove, by a preponderance of the evidence, that Mr. Algie breached the *Contract Agreement* by interfering with Dr. Woodward's exclusive or joint marketing rights under the *Contract Agreement*.

**36.  Mr. Algie's refusal to pay sales commissions to Dr. Woodward.**

**a.**  As found above, the *Contract Agreement* does not give Dr. Woodward the right to any sales commissions, and Dr. Woodward did not prove, by a preponderance of the evidence, that Mr. Algie made any enforceable contractual promise to pay sales commissions outside of the *Contract Agreement*.

**b.**  Even if Mr. Algie's and Dr. Woodward's post-contract agreement to a $5,000 per-kit commission had not been abnegated, it was not supported by additional consideration from Dr. Woodward and, thus, would not be enforceable.  *Peters v. Kendall*, 999 N.E.2d 1030, 1035-36 (Ind. Ct. App. 2013), *trans. denied*.

**c.**  Even if there were an enforceable agreement that Dr. Woodward receive a sales commission, there have been no sales for which Dr. Woodward would be owed a commission.  While Mr. Woodward obtained "pre-sales" of kits in return for deposits securing the customers' priority placements for deliveries, none of the pre-sales consummated in sales of, and payment for, actual kits.  All of the pre-sale customers canceled their pre-sales and obtained refunds of their deposits.  There have been no other sales of LP1 kits and Mr. Algie terminated Dr. Woodward's marketing rights and their business relationship in October 2012.

**d.**  Dr. Woodward did not prove, by a preponderance of the evidence, that Mr. Algie breached the *Contract Agreement* by failing to pay sales commissions to Dr. Woodward.

**37.  Mr. Algie refused to surrender LP1 properties to Dr. Woodward to be commercially marketed by him.**

**a.**  The *Contract Agreement* provides that, "[s]hould unforeseen circumstances prevent David Algie from completing the project within 24 months then Loyd Woodward has the obligation and right to commercially market all properties regarding the LP1 now in custody of David Algie."

**b.**  In its ruling on Dr. Woodward's motion for summary judgment, the Court construed the term "completing the project" to mean completing the LP1 prototype to the point of flight certification. *Entry on Plaintiff's Motion for Summary Judgment* [doc. 209] ("*Entry*"), at 19.  The Court found that this construction is the most natural and plain meaning of the language and the one that harmonizes and is consistent with the language of the *Contract Agreement* as a whole.  *Id.*  At trial, the parties did not persuade the Court that its construction is wrong.

**c.** Dr. Woodward contends that the term "to the point of flight certification" means that the LP1 prototype has achieved final flight certification.  Mr. Algie contends that the term means that the flight-certification process is ready to commence.  In its *Entry*, the Court held, and it holds now, that the term is ambiguous and, therefore, will be construed

16

against Dr. Woodward.  At trial, Mr. Woodward did not show any facts or law that persuaded the Court that the term is not ambiguous.

**d.**  Dr. Woodward contends that the term "unforeseen circumstances" includes circumstances that are attributable to Mr. Algie, such as his failure or refusal to employ existing, proven, and readily available technologies in the LP1 prototype, rather than custom designing many unique components that required more time to complete.  Mr. Algie contends that the term means occurrences such as natural disasters, supply disruptions, and Acts of God.  In its *Entry*, the Court held, and it holds now, that the term is not ambiguous and that it means the type of catastrophic and uncontrollable events described by Mr. Algie and does not include the usual delays and problems that are characteristically encountered during the invention, development, and construction of a prototype of a novel experimental aircraft.  *Entry*, at 23-24.  The *Contract Agreement* does not contain any representation by Mr. Algie or agreement by the parties that the prototype must incorporate certain technologies, and Dr. Woodward did not prove that any such representations or agreements were made outside the *Contract Agreement*.

As found above, from December 2009 to October 2012, there were no natural disasters; catastrophic events; interruptions of supplies; incapacitations of Mr. Algie; destruction of the prototype, Mr. Algie's shop, or supplies; or other Acts of God that prevented completion of the LP1 prototype or the commencement of flight certification.

**e.**   Dr. Woodward did not prove by a preponderance of the evidence, that unforeseen circumstances prevented Mr. Algie from completing the LP1 prototype to the point that the flight-certification process could commence.

**f.**   In addition, Dr. Woodward waived the twenty-four-month time period.  He testified that he repeatedly gave Mr. Algie "more time."[3]   At the time that Mr. Algie terminated the parties' business relationship under the *Contract Agreement*, almost ten months had passed since the twenty-four-month period had expired and Dr. Woodward had not invoked or taken any action to effect his asserted rights to commercially market LP1 properties.  Dr. Woodward did not prove by a preponderance of the evidence that his repeated grants of more time to Mr. Algie constituted agreements by them that Dr. Woodward was only postponing his right to commercially market the LP1 properties.

**g.**   Dr. Woodward presented evidence that the LP1 prototype was not ready for the flight-certification process to begin by December 2011 and Mr. Algie presented evidence that it was ready.  Because the Court finds and concludes that no unforeseen circumstances prevented the completion of the LP1 prototype to the point of flight-

---

[3] Mr. Algie's entreaties for "more time" do not mean that he agreed that Dr. Woodward obtained ownership rights in the LP1 properties after the twenty-four-month deadline passed and that he was agreeing only to postpone the "day of reckoning."  At the twenty-four-month mark, Dr. Woodward had been voluntarily paying $7,000 each month to Mr. Algie and financially supporting the LP1 project well beyond the requirements of the *Contract Agreement*, and he continued to do so until Mr. Algie terminated their business relationship in October 2012.  It is reasonable to infer that Mr. Algie's entreaties for "more time" were pleas for Dr. Woodward to be patient and to continue his funding of the project.  The parties did not disprove this latter inference at trial.

certification, it need not determine whether the LP1 prototype was completed to that point.

**h.** In addition and alternatively, the Court finds that it cannot determine whether the LP1 prototype was completed to the point of flight certification because no evidence was introduced by either party showing in what state an experimental aircraft must be for flight certification to begin and whether the LP1 prototype was in such a condition. Mr. Algie contended that the initial flight-certification inspections could begin while the aircraft was partially disassembled (in fact, he testified that it was preferable as it afforded the D.A.R. better opportunities for full inspection of the components) and that any problems that the prototype was experiencing at the time would not prevent the commencement of the flight-certification process. Dr. Woodward testified to a litany of problems with the prototype, including incomplete components. However, what was missing was evidence (through, for example, Federal Aviation Administration regulatory documents and/or expert-witness testimony) showing the criteria for initiation of flight certification and showing whether the LP1 prototype met those criteria in December 2011 or at any time before termination of the business relationship under the *Contract Agreement*.

**i.** The *Contract Agreement* gives Dr. Woodward the "obligation and right" only to "commercially market all properties regarding the LP1 now in custody of David Algie." It gives him the right to market the properties; it does not give him any ownership in the LP1 properties or a right to any of the proceeds from sales of the properties.

19

**j.** Dr. Woodward did not prove by a preponderance of the evidence that Mr. Algie breached the *Contract Agreement* by failing and refusing to surrender to Dr. Woodward all properties regarding the LP1 so that Mr. Woodward could commercially market them.

**Dr. Woodward's claim for deception and conversion:**

**38.**  Dr. Woodward's claim for deception and conversion is contingent on the existence of a partnership between him and Mr. Algie.  *Verified Amended Complaint for Damages and Injunctive and Other Equitable Relief* [doc. 118], Count 5, ¶¶ 92-99.

**39.**  "A partnership is an association of two (2) or more persons to carry on as co-owners a business for profit . . . ."  Ind. Code 23-4-1-6(1).  "The two requirements of a partnership are:  (1) a voluntary contract of association for the purpose of sharing profits and losses which may arise from the use of capital, labor, or skill in a common enterprise; and (2) an intention on the part of the parties to form a partnership."  *Bunger v. Demming*, 40 N.E.3d 887, 903 (Ind. Ct. App. 2015), *trans. denied*.

**40.**  The plain and ordinary meanings of the terms of the *Contract Agreement* did not create a partnership.  The *Contract Agreement* does not mention the formation of a partnership and does not express or indicate an intention by either party to form a partnership.  In addition, the *Contract Agreement* does not provide for the sharing of profits and losses of the LP1 business.  Even granting Dr. Woodward's construction of the contract and his assertion of other agreements, he was entitled to receive only sales commissions and the proceeds from the sale of all LP1 properties only if the LP1 prototype was not certified within twenty-four months.  Under his theories, Dr.

Woodward was entitled to his sales commissions regardless of the business' profit or loss, and his entitlement to the proceeds of liquidation of the LP1 project's assets would arise only before the business commenced.  The *Contract Agreement* contains no other terms providing for the sharing of profits and losses or for the distribution of any assets or revenues of the LP1 business.

    **x.** The Court found Mr. Algie's testimony credible and Dr. Woodward's testimony not credible regarding whether the parties agreed or intended to form a partnership.

    **41.**  Dr. Woodward's repeated requests of Mr. Algie to form a partnership in October 2012 indicate that a partnership was not then in existence.  The occasional use of the word "partner" or "partnership" by Mr. Algie when describing his relationship with Dr. Woodward does not show that he had entered into a partnership with Dr. Woodward. It is more likely that Mr. Algie used these words in their "lay" sense, meaning that he and Dr. Woodward were working together to get the LP1 prototype completed and kits to market, rather than in their technical legal sense.

    **42.**  Mr. Algie did not intend and did not agree to create a partnership with Dr. Woodward.  The *Contract Agreement* did not create a partnership between them.  Dr. Woodward and Mr. Algie did not agree to form a partnership outside of the *Contract Agreement*.  No partnership between Dr. Woodward and Mr. Algie existed at any time.

    **43.**  Dr. Woodward did not prove, by a preponderance of the evidence, that Mr. Algie commited deception or conversion.

**Mr. Algie's claim for promissory estoppel:**

**44.**   Mr. Algie alleges that Dr. Woodward's promise to fly the LP1 prototype to airshows for marketing purposes and to fly it for the number of miles required by the Federal Aviation Administration for final flight certification ("mile logging"), without compensation and while paying the costs thereof, was the dispositive inducement for Mr. Algie to execute the contract, leave his lucrative career in the Indy-car field, and devote his full-time efforts to finalizing the LP1 prototype.   Mr. Algie contends that Dr. Woodward's promise represented a significant cost savings of approximately $50,000 for mile logging and air-show marketing.   Mr. Algie claims that, leaving his IndyCar career in reliance on Dr. Woodward's promise, cost him salary of approximately $189,833.33 between December 2009 and October 2012 and rendered it unlikely that he could re-enter the IndyCar field after being gone for so long.

**45.**   In Indiana, a promissory estoppel claim has the following elements:  "(1) a promise by the promissor; (2) made with the expectation that the promissee will rely thereon; (3) which induces reasonable reliance by the promissee; (4) of a definite and substantial nature; and (5) injustice can be avoided only by enforcement of the promise." *Indiana Bureau of Motor Vehicles v. Ash, Inc.*, 895 N.E.2d 359, 367 (Ind. Ct. App. 2008). "Actual fraud on the part of the promisor is not a requisite but there must be some false representation or concealment of facts."  *Reeve v. Georgia-Pacific Corp.*, 510 N.E.2d 1378, 1384 (Ind. Ct. App. 1987).

46.    Mr. Algie's promissory-estoppel claim depends on his testimony that Dr. Woodward told him on October 19, 2012 that he would not fly the airplane.  According to Mr. Algie, Dr. Woodward's remark was his response to Mr. Algie telling him that he should simply end his financial support for the LP1 project and Mr. Algie will eventually get the airplane to him.  Dr. Woodward denies making the statement.

47.    Mr. Algie contends that he was injured by Dr. Woodward's *repudiation* of his promise to fly the mile-logging flights and exhibit the LP1 prototype at air shows, but Mr. Algie did not assert a claim for anticipatory breach of the *Contract Agreement*.  Mr. Algie did not allege or prove by a preponderance of the evidence that Dr. Woodward's promise to fly the LP1 was objectively false or misleading when he allegedly made it before the *Contract Agreement* was executed.

At the time that Dr. Woodward allegedly repudiated his promise to fly the LP1 in October 2012, the prototype was not flight certified or fully assembled and, therefore, there was no opportunity or necessity in the near future for a pilot to fly any mile-logging flights or to fly it to air shows.  In addition, Mr. Algie terminated the parties' business relationship[4] either immediately or within a few days after Dr. Woodward's alleged repudiation.

---

[4] The parties did not make any claims or allegations regarding how, if at all, Dr. Woodward's right under the *Contract Agreement* to purchase an LP1 kit for $40,000 was affected by Mr. Algie's termination of Dr. Woodward's marketing rights and their business relationship respecting the development of the LP1 project.

Because Mr. Algie claims that he was injured by Dr. Woodward's repudiation of his promise to fly and has not proven by a preponderance of the evidence that that promise was false or misleading when it was made, he has failed to prove that he was damaged by Dr. Woodward's promise to fly the LP1 prototype.

48.  It is unnecessary for the Court to find whether Dr. Woodward promised Mr. Algie that he would fly the LP1 prototype before the *Contract Agreement* was executed, whether Mr. Algie relied on that promise as the dispositive inducement for him to sign the *Contract Agreement*, and whether Mr. Algie consequently suffered injuries in the form of foregone earnings and piloting costs.

49.  Mr. Algie did not prove, by a preponderance of the evidence, that Dr. Woodward is liable to him for his foregone IndyCar earnings from December 2009 to at least October 2012 and for the costs and expenses of a replacement pilot under a theory of promissory estoppel.

### Conclusion

Mr. Algie is not liable to Dr. Woodward on Dr. Woodward's claims for breach of contract, deception, and conversion, and Dr. Woodward shall take nothing by way of his complaint in this Cause.

Dr. Woodward is not liable to Mr. Algie on Mr. Algie's claim for promissory estoppel, and Mr. Algie shall take nothing by way of his counterclaim in this Cause.

Linda Algie was dismissed from all claims and counterclaims in this Cause.

**DONE this date:** 09/28/2016

Denise K. LaRue
United States Magistrate Judge
Southern District of Indiana

Distribution to all ECF-registered counsel of record *via* ECF-generated e-mail.

Distribution *via* first-class mail on:

Loyd Woodward
6501 Highway 208
Girard, Texas  79518.